UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

MARK T. LAVERY,

Plaintiff,

-against-

KALSHI INC.,

Defendant.

25 Civ. 14184

Hon. Matthew F. Kennelly

<u>**KALSHI INC.'S MOTION TO DISMISS THE COMPLAINT**</u>

i

**TABLE OF CONTENTS**

**INTRODUCTION**.......................................................................................................................... 1

**FACTUAL BACKGROUND** ...................................................................................................... 2

**ARGUMENT**............................................................................................................................... 5

    A.       There Is No Personal Jurisdiction Over Kalshi Inc. ........................................................ 5

    B.       The State Statutes Do Not Apply To Plaintiff's Allegations......................................... 8

    C.       The Complaint Is Preempted ......................................................................................... 9

    D.       The Complaint Fails To State A Claim.......................................................................... 19

**CONCLUSION** ........................................................................................................................... 25

ii

## **TABLE OF AUTORITIES**

**CASES**

**Page(s)**

*Am. Agric. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992)............. 12, 16

*Anderson v. Naperville Rotary Charities Inc.*, 2019 IL App (1st) 180312-U .............................. 21

*Arizona v. United States*, 567 U.S. 387, 406 (2012).................................................................... 18

*Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ........................................................................ 20

*Avery v. State Farm Mut. Automobile Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005)......................... 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) .............................................................. 19

*BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) ...................................................................... 5

*Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)..................................................................... 20

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939
    *(7th Cir. 2000)* ........................................................................................................................ 5

*Cf. Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740 (1985) ........................................ 11

*Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) .............................................. 15

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) ......................................................... 13

*Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 807
    (Ky. 2020) ........................................................................................................................... 22

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ..................................... 10, 17

*Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)....................................................................... 5

*Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 187 (3d Cir. 2006)....... 15

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ............................... 10, 17

*FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) .................................................... 14

*Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *3 (D.N.J. June 20, 2007) ............. 4, 11, 23, 24

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 806 F. Supp. 3d 1015, 1036-37
    (N.D. Cal. 2025)......................................................................................................... 21, 22, 24

*KalshiEX LLC v. Flaherty,* 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ............................ 17

*KalshiEX LLC v. Orgel, et al.*, 26 Civ. 34, Dkt. No. 48 (Feb. 19, 2026)............................... 18, 19

*KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *5, *6 (D. Nev. Apr. 9, 2025).................... 17

*Kirby v. Keeneland Ass'n, Inc.*, 672 S.W.3d 212 (Ky. Ct. App. 2023).................................. 22, 25

*Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980)..................................................................... 15

*Merrill Lynch v. Curran*, 456 U.S. 353, 356 (1982).................................................................... 16

*Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 669 (7th Cir. 2010)......................................... 9

*Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992)............................................................. 11, 13

*Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 735 (N.D. Ill. 2017).............................. 5

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-12
    (1983)................................................................................................................................... 12

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 204 (N.D. Ala. 1981) ... 17

*Palmer v. Liggett Grp., Inc.,* 825 F.2d 620, 625-26 (1st Cir. 1987) ............................................ 12

*Pettigrew v. Oppenheimer & Co.*, 582 F. Supp. 98, 101 (D. Mass. 1984) ............................. 12, 18

*RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997)...................................... 6, 7

*Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947)................................................................ 14

*Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)........................................................ 16

*Salamon v. Taft Broadcasting Co.*, 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984) ...................... 9

*Saul Stone & Co. v. Browning*, 615 F. Supp. 20, 22-23 (N.D. Ill. 1985) .................................... 15

*Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509 (7th Cir. 2016)................... 21, 24
*Spartan Motors, Inc. v. Lube Power, Inc.*, 786 N.E.2d 613, 619 (Ill. App. 2nd Dist. 2003).......... 7
*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024).. 11
*Union Underwear Co., Inc. v. Barnhart*, 50 S.W. 3d 188, 190 (Ky. 2001).................................. 9
*United States v. Brien*, 617 F.2d 299, 309-10 (1st Cir. 1980) ...................................... 13
*Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) ........................................ 10

## STATUTES

17 C.F.R. § 38.1101(a)(1).................................................................................................. 18
17 C.F.R. § 38.600............................................................................................................ 18
7 U.S.C. § 16(e) ............................................................................................................... 13
7 U.S.C. § 2(a)(1)(A) ............................................................................................ 10, 12, 13, 16
7 U.S.C. § 2(A)(1)(a) ....................................................................................................... 19
7 U.S.C. § 6c (1958) ........................................................................................................ 14
7 U.S.C. § 7....................................................................................................................... 25
7 U.S.C. § 7(d) .................................................................................................................. 16
7 U.S.C. § 7a-2(c)(5)(C)(i) ............................................................................................... 17
7 U.S.C. §§ 2(e), 7(a)....................................................................................................... 16
7 U.S.C. §§ 6................................................................................................................... 16
735 ILCS 5/2-209(c)........................................................................................................... 6
Illinois Loss Recovery Act, 720 ILCS 5/28................................................................. 4, 20, 21, 24
KRS 372.040....................................................................................................................... 4
Mass. Gen. Laws Ch. 137 § 1 ......................................................................................... 4, 23
Ohio Rev. Code Section § 2915.02(C) ........................................................................... 21, 25
Ohio Rev. Code Section 3763.02................................................................................... 21, 22, 24
Ohio Rev. Code Section R.C. § 3763.01 ....................................................................... 4, 21
Ohio Rev. Code Section Section 3763.04........................................................................ 22

## OTHER AUTHORITIES

120 Cong. Rec. S30464 (daily ed. Sept. 9, 1974) (statement of Sen. Curtis)......................... 14, 15
Amicus Brief of Commodity Futures Trading Commission, at 2, *N. Am. Derivatives Exch., Inc.
v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 37.2.............................................. 15
Appellant's Brief, at *27,
*KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).................................. 15
*Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on
Agriculture & Forestry*, 93d Cong., 2d Sess., at 229 (1974)...................................... 14

## REGULATIONS

17 C.F.R. § 38.100............................................................................................................ 16
17 C.F.R. § 38.151(b), (b)(1)........................................................................................... 19
17 C.F.R. § 38.200............................................................................................................ 18
17 C.F.R. § 38.3(a)............................................................................................................ 16

**INTRODUCTION**

Kalshi Inc. respectfully submits this motion to dismiss Plaintiff Mark Lavery's Complaint, Dkt. No. 1 (the "Complaint")[1] pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Kalshi Inc. is a holding company incorporated in Delaware and headquartered in New York. One of Kalshi Inc.'s corporate affiliates, KalshiEX LLC, which is not a defendant in this case, is a Commodity Futures Trading Commission ("CFTC")-registered designated contract market ("DCM"), also incorporated in Delaware and headquartered in New York, that lists swap contracts for trading and execution by its participants, functioning as an exchange for trading derivatives. Plaintiff does not allege that he is a participant on that exchange. However, using four states' statutory codification of an 18th-century English gambling law known as the "Statute of Anne," Plaintiff seeks to "claim a bounty" on penalties he believes those states would impose on Kalshi Inc. for facilitating trades that, he alleges, a man named Adhi Rajaprabhakaran ("Adhi") placed in an unspecified state at an unspecified time "at the Kalshi Gambling Hall."

Plaintiff's Complaint must be dismissed for a host of independent reasons. First, the Complaint fails to plead a basis for personal jurisdiction in Illinois over Kalshi Inc. Similarly, it fails to allege any connection between Adhi's trading losses, on which the lawsuit is premised, and the statutes of the four states Plaintiff claims would impose a penalty for those losses – Illinois, Ohio, Kentucky, and Massachusetts (the "Statutes"). There is no allegation that Adhi, whose residence is omitted from the Complaint, suffered an injury in any of those states, and no reason to believe that those states' laws would apply to the events at issue here. In addition to these threshold deficiencies of the Complaint, the anachronistic Statute of Anne laws on which Plaintiff relies are preempted by the federal regulatory scheme that governs transactions on a

---

[1] Unless otherwise specified, ¶ refers to paragraphs in the Complaint.

1

DCM.  Finally, even if there were a basis to apply the Statutes to the allegations here – which there is not – those allegations would still fail to state a claim under the Statutes.

For each of these reasons, Plaintiff's Complaint must be dismissed.

## FACTUAL BACKGROUND

Plaintiff Mark Lavery is a citizen of Illinois.  The sole defendant in this action, Kalshi Inc., is a holding company incorporated in Delaware, with its headquarters in New York.  (*See* March 6, 2026 Declaration of Richard Heaslip ("Heaslip Decl.," Exhibit A) ¶ 4).[2]  Kalshi Inc. is the parent company of KalshiEX LLC ("KalshiEX").  (Heaslip Decl. ¶ 5).  Although it is not alleged in the Complaint, KalshiEX is a financial services company that operates a derivatives exchange and prediction market on which users can buy and sell financial products known as "event contracts."  (Heaslip Decl. ¶ 7).   The KalshiEX exchange is federally regulated as a DCM by the CFTC pursuant to the Commodity Exchange Act of 1936, 7 U.S.C. § 1, et seq. ("CEA").  (Heaslip Decl. ¶ 7).[3]  It is a bona fide board of trade under the CEA.  KalshiEX was formed under the laws of Delaware and has its principal place of business in New York.  (Heaslip Decl. ¶ 6).

Plaintiff has structured his Complaint into three parts: background about himself, background about Adhi, and factual allegations against Kalshi Inc.

### Background about Plaintiff

Plaintiff describes himself as a "bounty hunter" who uses state laws derived from the Statute of Anne to collect "bounties" from gambling winners.  (¶¶ 6-7).  Here, he purports to act on behalf of an individual named Adhi Rajaprabhakarian.

---

[2] *See also* Paragraph 2 of the Complaint.

[3]  *See also* www.cftc.gov/pressroom/pressreleases/8302-20, last visited March 4, 2026.

**Background about Adhi Rajaprabhakaran**

The Complaint alleges that Adhi is a gambler who has lost thousands of dollars "in the Kalshi gambling hall," a term that is undefined. (¶¶ 25-26). It alleges that Adhi used to work at "Kalshi," at a time and in a role not identified in the Complaint, and that he has never sued Kalshi. (¶¶ 27-28). The Complaint then excerpts from a certain writing of Adhi's as follows:

> The fish are the product, and on parlays, the fish are the takers. When DraftKings reports an 8% hold, that's their cut of the fish flow – the systematic transfer of wealth from recreational bettors to the house. When Kalshi reports fee revenue of ~1%, that's just their toll for facilitating a much larger transfer. The other 7% flows directly from takers to makers, invisible in Kalshi's revenue but very real in economic terms.

(¶¶ 30-34). The Complaint defines "fish" as "naïve gamblers" who can be "exploited for all of [their] money" (¶ 32), but does not allege that Adhi was a "fish," that he participated in "parlays" (which appear to be the specific sphere in which, Adhi writes, "fish are the takers"), or that Kalshi Inc. was a "winner" in connection with Adhi's specific wagers. Nor does the Complaint provide any context or explanation for the references in Adhi's writing to "fee revenue," "toll," a "larger transfer," or "invisible" parts of Kalshi Inc.'s revenue.

Relying on this excerpt of a writing by Adhi, Plaintiff makes certain legal arguments. He argues that "Kalshi is the winner of wagers just like DraftKings" (¶ 36); that "[e]ach relevant state's law authorizes private plaintiffs to recover statutory penalties from an illegal gambling 'winner'" (¶ 38); and that Kalshi Inc. is a gambling "winner" (¶ 40).

**Factual Allegations**

The portion of the Complaint identified as "Factual Allegations" contains eight paragraphs. (¶¶ 42-49). The beginning paragraphs make general allegations about the business of Kalshi Inc.: that it "operates an online wagering market using real money on contingent outcomes" (¶ 42); and that it is "not licensed to operate gambling in Illinois, Ohio, Massachusetts

or Kentucky" but intentionally chooses not to "geofence" these states (¶¶ 43-44). The Complaint then makes a legal argument: "Every wager placed with Kalshi constitutes an illegal gambling loss within that state." (¶ 45).

The Complaint proceeds to allege that Adhi "placed numerous Kalshi wagers and incurred multiple losses above the statutory thresholds." (¶ 46). It claims that he failed to sue within the statutory period, and that "[t]housands of additional users," about whom absolutely no information is proffered, also suffered losses and did not timely file a claim. (¶¶ 47-48). The Complaint fails to allege that any of Adhi's losses (or trades) occurred in Illinois, Ohio, Kentucky, or Massachusetts, such that the statutes of those states would have any application here. Nor does it allege that Adhi resided in any of those states during the relevant time period. The Complaint also fails to allege when Adhi placed his trades or ceased placing them.

**Statutory Allegations**

Plaintiff pursues penalties under certain loss recovery statutes of four states: Illinois (720 ILCS 5/28-8), Ohio (Ohio Rev. Code § 3763.04), Kentucky (KRS 372.040), and Massachusetts (Mass. Gen. Laws. ch. 137 § 1). These Statutes derive from the Statute of Queen Anne, an English statute dating back to 1710 that authorized gambling losers and informers to sue to recover losses incurred "at any [t]ime or sitting by playing at [c]ards, [d]ice, [t]ables or other [g]ame or [g]ames whatsoever or by betting on the [s]ides or [h]ands of such as do play at any of the [g]ames aforesaid." *Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *3 (D.N.J. June 20, 2007). The purpose of these state corollaries to the English Statute of Anne was to "prevent gamblers and their families from becoming destitute due to gambling losses—and thus becoming wards of the State—by providing a method for the gambler's spouse, parent or child to recover the lost money from the winner." *Id.* Plaintiff's position is that under each state's Statute of

4

Anne, Kalshi Inc. is a gambling "winner" and therefore owes penalties under the respective statutes, on which he is entitled to take a "bounty."

## ARGUMENT

### A. There Is No Personal Jurisdiction Over Kalshi Inc.

#### 1. Legal Standard

"The plaintiff bears the burden of demonstrating personal jurisdiction." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 939 (7th Cir. 2000). Conclusory or vague allegations are not sufficient to make a prima facie showing of personal jurisdiction. *Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 735 (N.D. Ill. 2017). A plaintiff can demonstrate personal jurisdiction by establishing that there is general jurisdiction or specific jurisdiction over a defendant in the forum.

##### a. General Jurisdiction

The paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) "[I]n an exceptional case, a corporate defendant's operations in another forum may be so substantial and of such a nature as to render the corporation at home in that State." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (quotation marks omitted).

##### b. Specific Jurisdiction

Illinois's long-arm statute provides as follows, in relevant part:

> (a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State *as to any cause of action arising from the doing of any of such acts*:
>     (1) The transaction of any business within this State; . . .
>     (7) The making or performance of any contract or promise substantially connected with this State;…

5

(c) A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.

*See* 735 ILCS 5/2-209(c) (emphasis added).

Pursuant to the well-established "minimum contacts" analysis, specific jurisdiction may apply where a defendant has "purposefully established minimum contacts within the forum State" and where "those contacts would make personal jurisdiction reasonable and fair under the circumstances." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997) (quotation marks omitted). "Crucial to the minimum contacts analysis is showing that the defendant 'should reasonably anticipate being haled into court in the forum State,' because the defendant has 'purposefully availed itself of the privilege of conducting activities' there. *See id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-475 (1985)). "Remember, however, that specific jurisdiction requires that the suit 'arise out of' or 'be related to' these minimum contacts with the forum state. We cannot simply aggregate all of a defendant's contacts with a state . . . as evidence of the constitutionally-required minimum contacts." *RAR*, 107 F.3d at 1277.

### 2. Analysis

The Complaint fails to plead a basis for asserting personal jurisdiction over Kalshi Inc. in this forum. As acknowledged in the Complaint, Kalshi Inc. is a Delaware corporation headquartered in New York. It thus does not fit the "paradigm" for general jurisdiction in Illinois. Nor are there any allegations in the Complaint that would make this an "exceptional" case. Far from alleging that Kalshi Inc.'s operations in Illinois are so substantial that Kalshi Inc. is "at home" in the state, the Complaint merely alleges that Kalshi Inc. does not take affirmative steps to exclude Illinois from its business activities by "geofencing" it. In truth, Kalshi Inc. is a holding company, and thus not the proper defendant in this action. But in any event, the notion that by ***not affirmatively excluding*** a state from its business activities, an out-of-state company

automatically consents to personal jurisdiction in that state, would nullify the requirements of general jurisdiction. Simply being available to transact business in a given state – which is all that is alleged here with respect to Kalshi Inc. and Illinois – cannot by itself constitute operations in that state that are "so substantial" that they give rise to general jurisdiction. If nothing more than this were required, the exercise of general jurisdiction over out-of-state companies based strictly on their operations in the forum state would not be "exceptional," as the case law describes it – it would be routine.

Nor is there any basis alleged in the Complaint for the exercise of specific jurisdiction over Kalshi Inc. Illinois's long-arm statute has no application here because the Complaint does not state that the injury alleged in the lawsuit – Adhi's losses in trades placed on futures contracts – arose out of Kalshi Inc.'s forum-related activities. Again, Kalshi Inc. is a holding company. But even more to the point, the Complaint does not allege that Adhi placed his trades in Illinois; that he incurred losses in Illinois; that he was a citizen or resident of Illinois during the relevant time period; or that he ever came into contact or interacted with Kalshi Inc. in any way within the state of Illinois. In short, nothing in the Complaint suggests that anything happened in Illinois that gave rise to this action. There is thus no specific jurisdiction over Defendant in this forum. *See RAR*, 107 F.3d at 1277 *see also, e.g.*, *Spartan Motors, Inc. v. Lube Power, Inc.*, 786 N.E.2d 613, 619 (Ill. App. 2nd Dist. 2003) (claim of specific jurisdiction "quickly dispose[d] of" where "cause of action did not arise from the transaction of any business within this state") (quotation marks omitted).

Plaintiff does not plead any basis for the exercise of personal jurisdiction over Kalshi Inc. in this forum. This requires dismissal of the Complaint.

**B. The State Statutes Do Not Apply To Plaintiff's Allegations**

In addition to the absence of personal jurisdiction over Kalshi Inc., the Complaint suffers from another fundamental, and fatal, deficiency: the allegations for which Plaintiff seeks a "bounty" are completely unconnected to the state statutes under which Plaintiff pursues that bounty. Plaintiff's theory of recovery is that Kalshi Inc.'s alleged harming of Adhi implicated certain statutes in Illinois, Ohio, Kentucky, and Massachusetts. But the Complaint does not say how that is so. There is no explanation as to why Adhi's alleged interactions with Kalshi Inc. have anything to do with those states or their statutes. Adhi is not alleged to have placed trades, incurred losses, or even resided in any of the four states whose statutes Plaintiff invokes. Plaintiff does not plead any basis for applying the laws of those four states to the events alleged in the Complaint. The Complaint reads instead as if Plaintiff sought out four states that have Statute of Anne analogs on the books and used them to sue Kalshi Inc. regardless of where the alleged conduct took place. That is not a viable application of state statutes, including those at issue here.

It is axiomatic that state statutes cannot randomly be applied to penalize conduct by non-citizens that occurs outside those states. This would effectively dissolve the boundaries between states for purposes of the operation of law. Yet, based on the pleadings, this is what Plaintiff seeks to do. Adhi is not alleged to be a citizen of Illinois, Ohio, Kentucky, or Massachusetts, or to have suffered an injury by Kalshi Inc. in those states, but the Complaint proposes to use the statutes of those states to sue Kalshi Inc., which is also not a citizen of those states. There is no basis for this in the law.

Notably, even if Adhi were a citizen of Illinois, Ohio, Kentucky, or Massachusetts – and there is no allegation that he is – this still would not be sufficient to apply those states' Statute of

8

Anne analogs unless Adhi's alleged interactions with Kalshi Inc. took place in those states. As the Seventh Circuit observed in *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 669 (7th Cir. 2010), "Illinois [could not] forbid Indiana to sell firecrackers to residents of Illinois in Indiana." Likewise, the laws of Illinois, Ohio, Kentucky, or Massachusetts would not reach interactions between Adhi and Kalshi Inc. outside those states notwithstanding Adhi's citizenship, as this would "exalt the public policy of one state over that of another." *Mills*, 593 F.3d at 667-68. *See also, e.g.*, *Union Underwear Co., Inc. v. Barnhart*, 50 S.W. 3d 188, 190 (Ky. 2001) (holding that Plaintiff was not entitled to recovery under a Kentucky statute where Plaintiff was not a Kentucky resident and suffered the alleged harm in either South Carolina or Alabama, even though defendant-tortfeasor was based in Kentucky); *Avery v. State Farm Mut. Automobile Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005) ("[A] statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute.").

The Complaint offers no basis to apply the statutes of Illinois, Ohio, Kentucky, or Massachusetts to the alleged conduct at issue. This is a second reason why the Complaint must be dismissed.

### C. The Complaint Is Preempted

A third reason the Complaint must be dismissed is that it is preempted. The Statute of Anne analogs at issue, which are relics from a "vanished era" when weak state enforcement powers "made necessary the use of [third-party] rewards for informers," *Salamon v. Taft Broadcasting Co.*, 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984), are preempted by federal law. The purpose of the Statutes was to deter and penalize participants in the challenged transactions, and where those transactions take place on a CFTC-registered DCM, Congress has made clear that the CFTC has exclusive jurisdiction to regulate such conduct.

## 1. Legal Standard

A "fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Thus, state laws that "interfere with, or are contrary to the laws of congress" are preempted and "invalid." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991). Federal law's preemption of state law may be express or implied. There are two types of preemption: field preemption and conflict preemption. Field preemption occurs where Congress indicates an intent to exclusively occupy an entire regulatory field. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Conflict preemption occurs where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," as reflected in the language, structure, and underlying goals of the federal statute at issue. *Id.* at 153.

## 2. The CEA Expressly Preempts State Regulation of Conduct on a DCM

The Statutes cannot be applied to regulate transactions on a DCM because the CEA expressly provides that the CFTC is the *exclusive* regulator of transactions on a DCM. Specifically, Section 2 of the CEA states:

> The [CFTC] shall have ***exclusive jurisdiction*** . . . with respect to . . . ***transactions involving swaps*** . . . ***traded or executed on a contract market designated pursuant to section 7*** . . . or any other board of trade, exchange, or market . . . .

7 U.S.C. § 2(a)(1)(A) (emphasis added). Section 2 goes on to clarify that concurrent jurisdiction for other state and federal regulators is preserved only for regulation of ***off-exchange*** transactions:

> ***Except as hereinabove provided***, nothing contained in this section shall [ ] ***supersede or limit*** the jurisdiction at any time conferred on . . . regulatory authorities under the laws of the United States ***or of any State*** . . . ."

7 U.S.C. § 2(a)(1)(A) (emphasis added).

10

These provisions of Section 2 create two distinct spheres of regulatory jurisdiction: (1) jurisdiction over transactions on a DCM (or board of trade) and (2) jurisdiction over transactions that occur outside of such exchanges. *Cf. Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740 (1985) (noting that the presence of a savings clause alongside an express preemption provision helps delineate the scope of a statute's express preemption provision, because "[w]hile Congress occasionally decides to return to the States what it had previously taken away, *it does not normally do both at the same time*" (emphasis added)). As to the former category—regulatory jurisdiction over on-exchange transactions—the CEA confers *exclusive* jurisdiction to the CFTC, preempting regulation by any other state or federal authority. *See, e.g.*, *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992) (the plain meaning of "'exclusive' necessarily denies jurisdiction" to other entities not named in that provision); *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024) ("[E]xplicit statutory conferral of exclusive jurisdiction" to a federal authority withdraws "any concurrent jurisdiction" from state authorities "over that same subject matter").

Because the alleged transactions by Adhi took place on a "contract market designated pursuant to section 7," state laws regulating transactions on Kalshi's DCM[4] are expressly preempted under Section 2(a)(1)(A) of the CEA. This includes the Statutes, which were enacted to "supplement states' general anti-gambling provisions in an era when local governments' own regulatory and enforcement powers were much less effective than they are today." *Humphrey*, 2007 WL 1797648, at *3 (discussing Statutes of Anne).

Where the contract at issue is traded or executed on a DCM, any state law authority to impose a penalty for entering into an allegedly unlawful contract is expressly superseded and

---

[4] The DCM is also not operated by Kalshi Inc., the holding company defendant in this lawsuit..

11

limited by the CEA's grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A). Thus, for purposes of this motion, the Court need not decide whether the Statutes could *ever* be applied to a transaction like the ones at issue here. Rather, the Court need only find that the transactions at issue in this case occurred on a DCM to conclude that application of the Statutes here is preempted by federal law.

The Complaint is expressly preempted, and must be dismissed.

### 3. Field Preemption Bars Application of the Statutes in This Case

Plaintiff's claim under each of the Statutes is preempted under the principle of field preemption. In determining whether Congress intended to fully occupy a field, courts look to the pervasiveness of a regulatory scheme, as well as to statutory text and legislative history. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-12 (1983) (for purposes of field preemption, assessing "pervasive[ness]" and reading the statute in question textually, as well as against its legislative background). Each of these three indicia weigh decisively in favor of preemption.

At a minimum, the CEA preempts state "statutes which attempt to alter the operation of commodit[y derivatives] markets" like DCMs. *Pettigrew v. Oppenheimer & Co.*, 582 F. Supp. 98, 101 (D. Mass. 1984); *see also Am. Agric. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (when application of state law would "directly affect trading on or the operation of a futures market," it is preempted). Thus, to determine whether a particular state law is preempted, courts "look to the effect [the preemptive suit] will have on the federal scheme set up by Congress." *Palmer v. Liggett Grp., Inc.,* 825 F.2d 620, 625-26 (1st Cir. 1987).

### a. The CEA's text shows Congress's intent to occupy the field of regulation of transactions executed on DCMs.

In preemption analysis, "the purpose of Congress is the ultimate touchstone." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). The CEA's clear mandate that the CFTC retain exclusive jurisdiction over all transactions involving swaps that are traded or executed on a [DCM] is clear textual evidence of Congress's intent to occupy the field of regulation of transactions executed on a DCM. The plain meaning of "'exclusive' necessarily denies jurisdiction" to other entities not named in that provision, *Mississippi*, 506 U.S. at 77-78, supporting the conclusion that Congress intended to exclusively reserve for the CFTC the field of regulating DCM transactions. And courts have regularly found that the "exclusive jurisdiction" language of the CEA indicates an intent to preempt the field with respect to the regulation of derivatives and in other analogous contexts. *See, e.g.*, *United States v. Brien*, 617 F.2d 299, 309-10 (1st Cir. 1980) (recognizing, "primarily on the exclusive jurisdiction provision[s] of Section 2(a)(1)," that "Congress intended the CFTC to occupy the entire field of commodities futures regulation").

The CFTC's exclusive jurisdiction over trading on a DCM is no different. Exclusive jurisdiction over "swaps" contracts traded on a "contract market designated" by the CFTC necessarily denies the four states at issue here the ability to void contracts traded on a derivatives exchange and impose a penalty on the exchange (and other market participants), which are doing business in accordance with federal law and exclusively subject to federal regulation. Instead, the CEA preserves for states *only* the ability to regulate the field of commodities and futures contracts traded *outside* of CFTC-approved exchanges. *See, e.g.*, 7 U.S.C. § 2(a)(1)(A) (savings clause); 7 U.S.C. § 16(e) (providing that "[n]othing in the CEA preempts application of a "[s]tate statute . . . to any transaction in or involving any commodity . . . that is *not conducted on or*

13

*subject to the rules of a [DCM]*") (emphasis added). Congress's decision to authorize areas where state laws and jurisdiction can apply, yet repeatedly *exclude* from those areas the regulation of DCMs, reinforces the general rule that Congress intended to preempt the field of transactions on DCMs.

### b. The CEA's legislative history shows Congress's intent to occupy the field of regulation over transactions executed on DCMs.

The legislative history only underscores Congress's plain intent to occupy the field of regulating transactions on DCMs. Prior to the 1974 amendments, the CEA preserved state law as to "transactions" regulated by the CEA. 7 U.S.C. § 6c (1958) ("Nothing in this section or section 6b of this title shall be construed to impair any State law applicable to any transaction enumerated or described in such sections."). The Supreme Court had explained that *without* this language the CEA would "almost certainly conflict with state laws," but that this proviso "serve[d] the function of preventing supersedure and preserving state control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). In 1974, Senate drafters "deleted" this clause "to assure that Federal preemption is complete." 120 Cong. Rec. S30464 (daily ed. Sept. 9, 1974) (statement of Sen. Curtis). Had Congress intended to preserve state authority to regulate trading on DCMs, it would not have deleted this clause.

During the legislative process, Congress emphasized that one of its goals was to "avoid unnecessary, overlapping and duplicative regulation" in the derivatives markets. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). The Senate Agriculture Committee understood that the proposed amendments would bring "the futures markets" "under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess., at 229 (1974) (hereinafter "Senate Hearings"). Drafters later reiterated that regulation should be uniform with "all exchanges . . . under the *same*

14

set of rules." H.R. Rep. No. 93-975, at 76 (1974) (emphasis added). And the conference report to the 1974 amendments stated Congress's desire to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

Courts agree. In the decades following the 1974 amendments, courts of appeals, district courts, and state supreme courts repeatedly held that "the CEA preempts the application of state law" to regulate trading on DCMs. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) at 322; *see also, e.g.*, *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"); *Saul Stone & Co. v. Browning*, 615 F. Supp. 20, 22-23 (N.D. Ill. 1985) (noting that "[n]umerous courts have held that the exclusive jurisdiction provisions of the [CEA] prevent the application of state statutes." "Congress is presumed to know the federal courts' interpretation of a statute that it intends to amend." *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 187 (3d Cir. 2006). In recent filings, the CFTC has confirmed that it shares the view that its jurisdiction to regulate transactions on a DCM is exclusive, stating: "*[D]ue to federal preemption*, event contracts *never violate state law* when they are traded on a DCM." Appellant's Brief, at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphases added). And, recently, the CFTC stated in an amicus brief to the Ninth Circuit that "[s]tates cannot invade the CFTC's *exclusive jurisdiction* over CFTC-regulated [DCMs] by re-characterizing swaps trading on DCMs as illegal gambling." Amicus Brief of Commodity Futures Trading Commission, at 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 37.2 (emphasis added); *see also id.* at 21 (the CEA's exclusive jurisdiction provision "preempts application of state gambling laws to event contracts trading on DCMs governed by the CEA, whether the question is evaluated as a matter of field preemption or conflict preemption").

15

### c. The comprehensiveness of the CEA shows Congress's intent to occupy the field

The comprehensiveness of the regulatory scheme for regulating trading on DCMs confirms that Congress intended to preempt the field. *See Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). Congress enacted the CEA to create "a comprehensive regulatory structure" to oversee the swaps and "futures trading complex," *i.e.*, all DCMs. *Merrill Lynch v. Curran*, 456 U.S. 353, 356 (1982). In its "modern, more robust form," the CEA has a broader scope, created the CFTC, and vested the agency with "broad powers to administer and enforce the CEA." *Am. Agric. Movement*, 977 F.2d at 1155. Under this comprehensive framework, an exchange may only offer derivatives contracts after receiving the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100. To receive a CFTC designation, an exchange must first submit a detailed application to the CFTC explaining how the exchange will comply with the CFTC's myriad regulations. 17 C.F.R. § 38.3(a). The CFTC then conducts a comprehensive review of the entity's application to determine whether it meets the CFTC's standards. *Id.* § 38.3(a)(2). Once an entity is CFTC-designated as a federally regulated contract market, the CFTC has "exclusive jurisdiction" over the derivatives traded on the market. 7 U.S.C. § 2(a)(1)(A). DCMs are subject to an extensive framework of CFTC oversight. 7 U.S.C. § 7(d). The CFTC comprehensively regulates not only the designation of contract markets, but the transactions executed on them as well. The CEA contains comprehensive rules governing DCM transactions. 7 U.S.C. §§ 6 *et seq*.

The comprehensive regulatory scheme even extends to event contracts specifically. In 2010, Congress amended the CEA to create a "Special Rule" governing the regulation of event contracts, which authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest," including contracts that constitute

16

"gaming" or constitute "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). It is notable that Congress explicitly gave those powers to the CFTC, as they would be redundant if other state and federal law could regulate transactions on a DCM. This is further evidence of Congress's intent to grant the CFTC exclusive jurisdiction and comprehensive regulatory powers over event contracts.

> **d. Courts have already held that the CEA preempts state regulation in these circumstances.**

Two federal district courts have already held that field preemption applies to preempt state-regulation of swap transactions executed on a DCM. *See KalshiEX LLC v. Flaherty,* 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025); *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *5, *6 (D. Nev. Apr. 9, 2025) ("Congress intended to occupy the field" "of regulating CFTC-designated exchanges and the transactions conducted on those exchanges."), *vacated on other grounds*, 2025 WL 3286282 (D. Nev. Nov. 24, 2025). Courts have also held that the CEA field preempts state statutes analogous to the Statutes. For example, in *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 204 (N.D. Ala. 1981), the court held that the CEA would preempt an Alabama gambling statute purporting to "void all futures transactions in which delivery of the commodity is not intended."

> **4. The Complaint Is Conflict Preempted**

The Complaint is also "conflict preempted," because the Statutes on which it relies "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as evidenced by the language, structure, and underlying goals of the CEA. *de la Cuesta*, 458 U.S. at 154. Subjecting Defendant to the Statutes would "undermine[] the intended purpose and 'natural effect'" of the federal scheme for regulating CFTC-designated exchanges. *Crosby*, 530 U.S. at 373. Congress's intent was to develop a uniform regulatory scheme and

17

avoid subjecting regulated exchanges to conflicting legal regimes, which would lead to inefficient and inoperative contract markets. Courts agree that state laws that conflict with the CEA's aim of uniformity are conflict preempted. *Pettigrew*, 582 F. Supp. at 101 ("[The CEA] preempts laws which attempt to alter the federal regulatory scheme.").

Application of the Statutes here would act as an obstacle to Congress's uniformity objective for a number of reasons. For one, it would make a DCM liable for any ordinary losses incurred on its exchange—*simply because the loss occurred*. This would vastly inflate a DCM's required regulatory capital, make contracts more prone to potential manipulation, and make orderly trading impossible because people would potentially have a no-cost exit if they lost. *See* 17 C.F.R. § 38.200 (DCMs may only list contracts not readily susceptible to manipulation); § 38.600 (DCMs must ensure financial integrity of transactions); §§ 38.1101(a)(1), (e) (financial resources requirements for DCMs). It would also deter a DCM from offering certain types of event contracts based on the *in terrorem* effect of the application of the Statutes when the DCM's own regulator has already permitted the same contracts to be offered on the exchange

The application of the Statutes to sanction a DCM for providing certain swaps would create "a conflict in the method of enforcement" selected by Congress. *Arizona v. United States*, 567 U.S. 387, 406 (2012). A state law stands as an "obstacle" to a federal regulatory scheme where it adopts a different method of enforcement than that elected by the federal government, thereby throwing off kilter "the careful balance struck by Congress." *Id*.

For substantially these reasons, several weeks ago the United States District Court for the Middle District of Tennessee found that conflict preemption applies to the types of sports events contracts that can be purchased on KalshiEX's exchange. *See KalshiEX LLC v. Orgel, et al.*, No. 26 Civ. 34 (M.D. Tenn.), Dkt. No. 48 (Feb. 19, 2026). As that court noted, "[t]he CEA grants

18

the CFTC exclusive jurisdiction over swaps" pursuant to 7 U.S.C. § 2(A)(1)(a).  See *Orgel* at 13 (quotation marks omitted).  The court noted that application of certain Tennessee rules relating to bettors would effectively require KalshiEX to create a special Tennessee-only exchange, which would prevent KalshiEX from allowing "impartial" access nationwide to its platform, as it must. *See id.* at 19-20; *see also* 17 C.F.R. § 38.151(b), (b)(1) (requiring that under the CEA, a DCM "must provide its members . . . with impartial access to its markets and services").  This is a plain "conflict" for preemption purposes, as it would make it functionally impossible for KalshiEX to comply with both state and federal law.  The court also noted that even if such dual compliance were possible, the state law would "likely stand as an obstacle to the accomplishment of the CEA's primary objective: uniform regulation of the derivatives market."  *Orgel* at 20.  The same is true here.

For all of the reasons discussed above, Plaintiff's Complaint is preempted.

### D. The Complaint Fails To State A Claim

Even if the Complaint could survive all of the deficiencies discussed above – and it can survive none of them – it would still require dismissal because it fails to state a claim upon which relief can be granted.  The allegations in the Complaint do not comprise actionable conduct under any of the four statutes on which the Complaint seeks to rely.

#### 1. Legal Standard

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  A plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels

19

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

A complaint must allege sufficient facts that would allow the court "to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

662, 678–79 (2009); *see also, e.g.*, *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("[C]ourts

should not accept . . . conclusory legal statements.").

### a. The Statutes

The Complaint seeks a "bounty" on penalties it alleges would be imposed on Kalshi Inc.

under the Statute of Anne laws of four different states: Illinois, Ohio, Kentucky, and

Massachusetts.  The statutes of each state are similar, but not identical, and are briefly

summarized in relevant part below.

### i. Illinois

The Illinois Loss Recovery Act, 720 ILCS 5/28, addresses illegal, unregulated gambling

and permits a "loser"—or, in certain circumstances, a third party on behalf of a loser—to claw

back gambling losses from a "winner."  Illinois declares a broad swath of alleged gaming

transactions void *ab initio*:

> All promises, notes, bills, bonds, covenants, contracts, agreements,
> judgments, mortgages, or other securities or conveyances made . . . by any
> person whatsoever, where the whole or any part of the consideration
> thereof is for any money or thing of value, won or obtained in violation of
> any Section of this Article are null and void.

Sec. 28-7(a).  Section 28-8(a) provides a cause of action for the "loser" to recover the money

they lost to the "winner" in an alleged gambling transaction that is void under Section 28-7(a):

> Any person who by gambling shall lose to any other person, any sum of
> money or thing of value, amounting to the sum of $50 or more and shall
> pay or deliver the same or any part thereof, may sue for and recover the
> money or other thing of value . . . against the winner thereof . . . . No
> person who accepts from another person for transmission, and transmits,
> either in his own name or in the name of such other person, any order for

20

> any transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial . . . shall, under any circumstances, be deemed a "winner . . . ."

Third-party recovery is permissible under specific circumstances:

> If within 6 months, such person who under the terms of Subsection 28-8(a) is entitled to initiate action to recover his losses does not in fact pursue his remedy, any person may initiate a civil action against the winner . . . .

Sec. 28-8(b). A "winner" must be an individual or entity that is risking its own money. *See*

*Anderson v. Naperville Rotary Charities Inc*., 2019 IL App (1st) 180312-U (defendant gambling

sites did not qualify as "winners" by virtue of arranging the gambling transactions); *Sonnenberg*

*v. Amaya Grp. Holdings (IOM) Ltd*., 810 F.3d 509 (7th Cir. 2016) (host that takes a share of the

pot but has no stake in the outcome is not a "winner").

### ii. Ohio

The Ohio loss recovery statute, Ohio Rev. Code Section 3763.02, is "structured like the

Illinois statute," using the same construction of "winner" and limiting claims to those raised

against "winners." *In re Apple Inc. App Store Simulated Casino-Style Games Litig*., 806 F.

Supp. 3d 1015, 1036-37 (N.D. Cal. 2025). Like Illinois, Ohio deems a number of gaming

transactions void *ab initio*. *See* R.C. § 3763.01. Section 3763.01 goes on to provide that

transactions that are void *ab initio* do not include "any game of chance that is not subject to

criminal penalties under section 2915.02 of the Revised Code," which is Ohio's criminal code.

*Id*. (emphasis added). Ohio's criminal code, in turn, "does not prohibit conduct in connection

with gambling expressly permitted by law." § 2915.02(C).

Section 3763.02 provides a cause of action for the "loser" to recover the money they lost

to the "winner" in an alleged gambling transaction that is void under Section 3763.01:

21

> If a person, by playing a game, or by a wager, loses to another, money or other thing of value, and pays or delivers it or a part thereof, to the winner thereof, such person losing and paying or delivering, within six months after such loss and payment or delivery, may sue for and recover such money or thing of value or part thereof, from the winner thereof, with costs of suit.

§ 3763.02. Like its corollary in Illinois, the Ohio loss recovery statute exempts "any business transacted upon a regularly established . . . board of trade through a member thereof whose relation to the transaction is that of a broker only, and who actually delivers or receives the securities or other commodity." R.C. § 3763.02. Section 3763.04 provides for third party standing where the "loser" does not sue within the six-month period.

### iii.    Kentucky

Kentucky's loss recovery statute is "somewhat idiosyncratic." *In re Apple Inc.*, 806 F. Supp. 3d at 1043. As under the Illinois and Ohio statutes, only a winner may be sued; but unlike in those states, in Kentucky, a winner can in some circumstances include "the house taking a rake or a percentage of the pot." *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 807 (Ky. 2020). Therefore, a "winner" can potentially be a party that takes "a portion of the money lost." *Id.* at 808. Under the Kentucky statute, in relevant part:

> If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery.

KRS 372.020. A plaintiff will be barred from recovery "where the challenged wagering was authorized, permitted, or legalized (retroactively or otherwise)." *Kirby v. Keeneland Ass'n, Inc.*, 672 S.W.3d 212 (Ky. Ct. App. 2023) (affirming dismissal of action by trial court).

With respect to third-party recovery:

22

> If the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment.

KRS 372.040

### iv.    Massachusetts

Massachusetts's loss recovery statute (Mass. Gen. Laws Ch. 137 § 1) provides:

> Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, except for gaming conducted in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet, may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof.

A "winner" is "one who wins by playing at cards, dice or any other game, or by betting on the sides or hands of person[s] who play." *Humphrey v. Viacom, Inc.*, No. 06 Civ. 2768, 2007 WL 1797648, at *10 (D.N.J. June 20, 2007).

### 2.    The Complaint Fails to State a Claim under Any of the Statutes

The Complaint fails to state a claim under any of the Statutes. As a threshold matter, each of the Statutes only permits third-party recovery if the "loser" of the gaming transaction at issue fails to sue within a prescribed period of time following their losses or payment to the "winner" – six months in Illinois, Ohio, and Kentucky, and three months in Massachusetts. But the Complaint makes only a conclusory allegation that this period of time has elapsed since Adhi's losses. It says: "Adhi did not sue within the statutory periods." ¶ 47. It fails to allege the

23

date, the month, or even the year when Adhi's trades or losses occurred in any of the four states whose statutes it invokes to pursue a bounty for Plaintiff.[5] Simply asserting in a conclusory fashion that a required element of a legal claim has been met (here, the lapse of a period of time following Adhi's losses) is not a substitute for pleading facts that would support that element of the claim. Plaintiff does not plead a single fact in support of the conclusion that he now has the capacity to sue in Adhi's shoes. This alone is a basis to dismiss the Complaint for failure to state a claim.

Second, the Complaint fails to allege that Defendant is a "winner" under any of the four Statutes. Under the Illinois, Ohio, and Massachusetts Statutes, it is plainly not a winner because it is not a party to the transaction risking its own money.[6] *See Sonnenberg*, 810 F.3d at 510; *In re Apple Inc.*, 806 F. Supp. 3d at 1036-37; *Humphrey*, 2007 WL 1797648, at \*10. In addition, Defendant cannot constitute a "winner" under the Illinois or Ohio Statutes, because Defendant is a board of trade. *See* 720 ILCS 5/28-8(a)*;* Ohio R.C. § 3763.02. Nowhere, including in its excerpting from Adhi's writing, does the Complaint allege that Defendant is the counterparty to any trade – and in fact it is not.

But the Complaint also fails to allege that Defendant is a "winner" even under the potentially broader definition of that term under the Kentucky Statute. The Complaint's allegations about how Defendant gets "a cut" are limited to a specific context, apparently lifted from something Adhi has written elsewhere: Plaintiff (quoting Adhi) alleges that "on parlays," "the fish are the takers," and the money flows from the fish, as "takers," to "makers," defined as

---

[5] As discussed above, *supra* at 8-9, it also fails to allege, fatally, that Adhi suffered any losses in any of these four states.

[6] As discussed above, *supra* at 6, Kalshi Inc. is also not a proper defendant in this case, as it is a holding company, and thus it cannot be a "winner" in connection with the transactions at issue.

the "house." (¶ 34). "Fish" are defined as naïve gamblers who can be exploited for all of their money. (¶ 32). However, the Complaint does not allege anywhere that Adhi was a "fish," nor that any transactions he placed through Kalshi were "parlays." There is no basis in the Complaint to connect Adhi's external musings about fish and parlays to any transactions that Adhi personally placed through Defendant that would be at issue in this lawsuit. The Complaint is thus devoid of allegations that Defendant took a portion of the money that Adhi lost – let alone that the utterly speculative and anonymous "additional users" referenced passingly in the Complaint lost; it does not allege that Adhi was a "fish" who participated in "parlays," that he lost on those parlays, and that Defendant took a portion of the money lost on those parlays. Under each of the four Statutes, Plaintiff has failed to plead that Defendant is a "winner" against whom a claim could be asserted.

Third, the event contracts at issue are not unlawful. The CEA expressly authorizes the offering of event contracts on DCMs. *See* 7 U.S.C. § 7 (discussing registration of DCMs). It would be incoherent for the Statutes to penalize conduct expressly authorized by the federal government. *See supra* at 17-19; *see also* Ohio Rev. St. § 2915.02(C) (Ohio Statute of Anne "does not prohibit conduct in connection with gambling expressly permitted by law"); *Kirby*, 672 S.W.3d at 216 (affirming ruling of trial court that Kentucky Statute of Anne did not apply where "the challenged wagering was authorized").

The Complaint fails to state a claim, and cannot survive a challenge under Rule 12(b)(6).

## CONCLUSION

For all of the foregoing reasons, Plaintiff's Complaint must be dismissed.

25

Dated:  March 6, 2026
New York, New York

By:    MAX NICHOLAS LLC

_____/s/_____
Max Nicholas
40 Exchange Place, Suite 1800
New York, NY 10005
(646) 741-0229
maxn@maxnicholasllc.com
*Attorneys for Defendant Kalshi Inc.*