IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MARK T. LAVERY, | ) | |
| | ) | |
| Plaintiff, | ) | 25 CV 14184 |
| | ) | |
| v. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| KALSHI, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Christopher V. Langone
Attorney for Plaintiff, Mark Lavery

205 N. Michigan, #805
Chicago, IL 60602
(312) 720-9191
LangoneLaw@gmail.com

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMEMT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      Defendant's Motion Fails at the Threshold Because It Seeks Resolution of an
        Affirmative Defense (Preemption) Not Apparent on the Face of the Complaint . . 2

II.     At Minimum, Defendant's Preemption Defense Turns on Disputed Questions
        That Preclude Dismissal. . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . 4

III.    The Loss Recovery Act Claim States a Valid Cause of Action . . . . . . . . . . . . . . 5

IV.     The Kentucky Loss Recovery Act Supports Plaintiff's Claim . . . . . . . . . . . . . . 10

V.      The State Statutes Apply to the Alleged Conduct . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.     Defendant's Preemption Defense Fails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.      *Murphy*, not Defendant's abstraction of "derivatives markets,"
                supplies the proper starting point. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      There is no express preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      There is no field preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                1.      The statute's special rule and the gaming prohibition
                        affirmatively preserve, rather than extinguish,
                        state gambling law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
                2.      Defendant cannot show field preemption because these
                        contracts are not "swaps." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                3.      "Excluded commodities" does not save Defendant's motion . . . . . 20

        D.      There is no conflict preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        E.      Defendant's APA and Deference Arguments Are Meritless . . . . . . . . . . . . 22

F.      The Third Circuit's Preliminary Injunction Decision
        Does Not Support Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

G.      At minimum, preemption cannot be resolved on a motion to dismiss . . . . . . . . . 23

H.      Defendant's cases, properly read, either do not apply or
        support Plaintiff's position. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**TABLE OF AUTHORITIES**

**Statutes**

7 U.S.C. § 1a(47)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . .   19, 20

7 U.S.C. § 7a-2(c)(5)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18, 22

7 U.S.C. § 2(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 20

720 ILCS 5/28-8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

720 ILCS 5/28-8(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5, 7

Section 401.11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18, 19, 22

**Cases**

*American Agricultural Movement v. Board of Trade of Chicago,*
    977 F.2d 1147 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15. 16, 24, 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

*Bartlett v. Slusher*, 215 Ill. 348, 74 N.E. 370 (Ill. 1905) . . . . . . . . . . . . . . . . . . . . .   7

*Benson v. Fannie Mae Confections Brands, Inc.*, 944 F.3d 639 (7th Cir. 2019) . . . . . . . .   3

*Chi. Mercantile Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . .   17

*Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*,
    617 S.W.3d 792 (S. Ct. Ky. 2020) . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10-11

*Dew-Becker v. Wu*, 2020 IL 124472 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8, 9

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) . . . . . . . . . . . . . . . .   15, 25

*Holland v. Swain*, 94 Ill. 154 (Ill. 1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

*Indus. & Fin. Mkts. Ass'n v. CFTC*, 67 F. Supp. 3d 373 (D.D.C. 2014) . . . . . . . . . . . .   17

*KalshiEX LLC v. CFTC*, 2024 WL 4164694 (D.D.C. Sept. 12, 2024) . . . . . . . . . . . . . .   17

*KalshiEX LLC v. Flaherty,* 2025 WL 1218313 (D.N.J. Apr. 28, 2025) . . . . . . . . . . . . . .   17, 25

*KalshiEX LLC v. Flaherty,* 2026 U.S. App. LEXIS 9948 (3rd Cir. 2026) . . . . . . . . . . . . .   23

*KalshiEX, LLC v. Hendrick*, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) . . . . . . . . . . . . .   15, 19, 20-22, 25

*KalshiEX LLC v. Martin*, 2025 WL 2194908 (D. Md. Aug. 1, 2025) . . . . . . . . . . . . . . . .  15-18, 24-25

*Kizer v. Walden*, 198 Ill. 274 (Ill. 1902) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Larned v. Tiernan,* 110 Ill. 173 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..  17

*Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) . . . . . . . . . . . . . . . . . .  12

*Mississippi v. Louisiana*, 506 U.S. 73 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Moench v. Graff*, 212 Ill. App. 42 (Ill. App. 3rd Dist. 1918) . . . . . . . . . . . . . . . . . . . .  7

*Murphy v. NCAA*, 584 U.S. 453 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13-14, 17, 25

*NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706 (2001) . . . . . . . . . . . . .  9

*Pettigrew v. Oppenheimer & Co.*, 582 F. Supp. 98 (D. Mass. 1984) . . . . . . . . . . . . . . .  17, 25

*Rice v. Bd. of Trade of Chi.*, 331 U.S. 247 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Saul Stone & Co. v. Browning*, 615 F. Supp. 20 (N.D. Ill. 1985) . . . . . . . . . . . . . . . . .  17

*Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) . . . . . . . . . . . .  8

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144 (3d Cir. 2024) . .  15

*Triplett v. Seelbach*, 14 S.W. 948 (Ky. App. 1890) . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*United States v. Bornstein*, 423 U.S. 303 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Vinson v. Casino Queen, Inc.*, 123 F.3d 655 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . .  6

*Webb v. Iaderosa,* 2020 IL App (3d) 180609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9

*Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991) . . . . . . . . . . . . . . . . . . . .  3, 14

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004) . . . . . . . . . . . .  3

*Zellers v. White,* 208 Ill. 518 (1904) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 8, 9

**INTRODUCTION**

Defendant KALSHI, INC. ("Kalshi") argues that Lavery sued the "wrong" party. He did not. That argument works only if the Court accepts Defendant's fiction that it merely offers "financial products," in the form of "event contracts," traded on a federally regulated commodities exchange. Under that narrative, one must also accept the accompanying abstractions of a neutral "exchange," a separate clearing structure, and the entire edifice of federal preemption Defendant attempts to build. But Plaintiff does not accept that framing, and the Court need not accept it either.

Lavery alleges something much simpler and much more concrete. Using the internet, Kalshi operates what is, in substance, a nationwide virtual gaming hall—one that invites users to stake money on politics, sports, awards, public events, and even war. For centuries, states have wrestled with how to regulate gambling, what instruments may be wagered upon, and what entities profit from those wagers. Defendant's position would reduce all of that to nonsense. If Defendant is correct, then longstanding state authority over gambling could be evaded merely by relabeling bets as "event contracts," and a sportsbook as a "market."

Kalshi is the proper Defendant because Plaintiff alleges that Kalshi is not some distant bystander to the wagers placed on its platform, but a direct participant and economic beneficiary of them. Defendant's motion papers glide past the very article referenced in the Complaint, which describes prediction-market parlays as offering a way to quantify, in sportsbook terms, exactly how much users lose and where that money flows—not only to the exchange, but throughout the entire ecosystem. That is critical. Plaintiff's theory is not that Kalshi passively hosts transactions for others; it is that Kalshi profits from and operates a vertically integrated wagering model. In ordinary terms, Plaintiff alleges that Kalshi is the "house." That is enough at this stage. Whether Defendant ultimately proves the contrary is a merits question. But Plaintiff is entitled to plead the

1

facts he contends exists, not the regulatory labels Defendant prefers. If the platform functions as a sportsbook, if Kalshi profits as the operator, and if Kalshi is "a" winner from the wagers placed through its platform, then Kalshi is not the wrong Defendant at all. It is the obvious one.

Defendant's argument regarding personal jurisdiction fails for a separate reason.[1] Plaintiff was not required to plead personal jurisdiction in anticipation of a defense that may or may not be asserted. Personal jurisdiction is a waivable defense, and it is Defendant's burden to raise it properly. [Fed. R. Civ. P. 12(b)(2)]. Defendant does not convert a merits motion into a jurisdictional one merely stating, in passing, that the Complaint does not say enough about forum contacts. The absence of detailed jurisdictional allegations in the pleading is not itself a basis for dismissal. Plaintiff requests jurisdictional discovery on this issue.[2]

Finally, Defendant is likely going to boast in reply that it "won" in the Third Circuit, and the injunction against New Jersey regulatory authorities enforcing gambling state laws was affirmed by a 2-1 decision. But the standard on an injunction is not a merits determination. As that Court itself acknowledge, the standard applies was simply whether Kalshi's chance was "significantly better than negligible" and not even "more likely than not." That opinion is subject to en banc, and eventually, Supreme Court review. It is not binding; and, frankly, not persuasive.

**ARGUMENT**

**I.      Defendant's Motion Fails at the Threshold Because It Seeks Resolution of an Affirmative Defense (Preemption) Not Apparent on the Face of the Complaint.**

Defendant's motion fails at the outset because it asks the Court to resolve federal preemption, an affirmative defense, on a motion to dismiss where the defense is neither apparent

---

[1]     Defendant's arguments rely heavily on a declaration submitted in support of its motion. Those factual assertions—regarding corporate structure, regulatory status, and the nature of the Kalshi platform— are outside the Complaint and cannot be considered on a motion to dismiss under Rule 12(b)(6).

[2]     Plaintiff will file a separate motion seeking jurisdictional discovery.

2

on the face of the Complaint nor legally or factually, settled. A plaintiff is not required to plead around affirmative defenses, and dismissal under Rule 12(b)(6) is appropriate only where the complaint itself establishes an "impenetrable" defense. See *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). That is not the case here.

Preemption is a defense on which Defendant bears the burden. See *Benson v. Fannie Mae Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). And because preemption is disfavored—particularly in areas of traditional state police power—courts begin with a strong presumption against displacing state law absent a clear and manifest congressional intent. See *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605 (1991). That presumption carries special force where, as here, the challenged conduct falls within the States' historic authority to regulate gambling.

Defendant cannot overcome these standards at the pleading stage. Its argument depends on a disputed premise: that the conduct alleged in the Complaint constitutes federally regulated "swaps" traded on a designated contract market, rather than unlawful gambling subject to state law. But that characterization is not established by the Complaint and cannot be assumed as true on a motion to dismiss. At minimum, Defendant's position depends on factual and legal determinations that cannot be resolved on the pleadings.

The Complaint plausibly alleges something far more concrete. It alleges that Defendant operates a nationwide, internet-based platform that invites users to stake real money on contingent outcomes—including sports, politics, and public events—and that users incur losses through those wagers. It further alleges that Defendant profits from and operates this system. Taken as true, those allegations describe a wagering enterprise, conduct that falls squarely within the States' traditional police power, not a neutral financial exchange engaged in abstract derivatives trading.

3

Whether Defendant's preferred labels ("event contracts," "swaps," or "designated contract market") ultimately withstand scrutiny is a merits question. It turns on statutory interpretation, regulatory context, and factual development regarding the nature of the products at issue. Those determinations cannot be made on the face of the Complaint and are therefore inappropriate for resolution under Rule 12(b)(6). That is dispositive. Because preemption is not apparent on the face of the Complaint, and because Defendant's theory depends on contested issues that go to the merits of the case, the Court need not, and should not, resolve Defendant's sweeping preemption argument at this stage. The motion should be denied on that basis alone.

## II. At Minimum, Defendant's Preemption Defense Turns on Disputed Questions That Preclude Dismissal.

Even if the Court were to consider Defendant's preemption arguments at this stage, dismissal would still be improper because those arguments turn on unresolved questions central to the case. Defendant's theory rises or falls on the assertion that the challenged transactions qualify as "swaps" subject to the Commodity Exchange Act's exclusive jurisdiction provision. But the Complaint does not establish that premise. To the contrary, it plausibly alleges that the transactions are wagers on contingent outcomes (i.e., gambling) not financial derivatives used to transfer or hedge economic risk. The distinction is critical, because the scope of any federal preemption depends on the nature of the underlying conduct. If the transactions are not swaps, the foundation of Defendant's preemption argument collapses.

That issue cannot be resolved on the pleadings. Courts do not accept a defendant's characterization of disputed conduct where the complaint plausibly alleges an alternative interpretation. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor may a defendant convert its preferred regulatory framing into a basis for dismissal by labeling the conduct at issue in terms

4

favorable to its defense. At this stage, the Court must accept Plaintiff's allegations and draw all reasonable inferences in his favor.

Defendant's position also raises substantial questions regarding the interaction between federal commodities regulation and state gambling law—an area where courts apply a presumption against preemption and require clear congressional intent to displace state authority. The Commodity Exchange Act does not clearly and manifestly eliminate state regulation of wagering activity, particularly where the statute itself contemplates that certain "event contracts" may involve "gaming" or conduct unlawful under state law. At a minimum, the scope of any preemption in this context is not settled. Accordingly, even if Defendant's preemption arguments may ultimately be litigated at a later stage, they do not provide a basis for dismissal under Rule 12(b)(6). The Court should decline to resolve those issues on the pleadings and allow the case to proceed.

### III. The Loss Recovery Act Claim States a Valid Cause of Action

720 ILCS 5/28-8(a) provides that "[a]ny person who by gambling shall lose to another person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same *or any part thereof*, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof." (emphasis added). The statute goes on to say that "[i]f within 6 months, such person who under the terms of Subsection 28-8(a) is entitled to initiate an action to recover his losses does not in fact pursue his remedy, any person[3] may initiate a civil action against the winner." 720 ILCS 5/28-8(b)(emphasis added). This provision of the Illinois Criminal Code is commonly referred to as the Loss Recovery Act

---

[3] Defendant's repeated characterization of Plaintiff as a "bounty hunter" is rhetorical and irrelevant. The Illinois legislature expressly authorized private enforcement by "any person" under 720 ILCS 5/28-8(b). Plaintiff's role is therefore not an anomaly—it is the mechanism the statute itself provides.

("LRA").[4] The LRA establishes a private enforcement mechanism allowing recovery of unlawful gambling losses from the "winner" of the wager.

The LRA is not a typical civil damages provision; it is a statutory enforcement mechanism designed to suppress gambling by stripping unlawful gains from those who reap them. The Illinois Supreme Court has long emphasized that the statute operates not to compensate losers, but to punish winners and deter gambling itself. In *Larned v. Tiernan*, the Court explained that the statute functions to "mulct the winner in the loss of his gains," and that "it matters not where the recovery… goes… nor by what mode the recovery is had." 110 Ill. 173, 178 (1884). The Court reiterated the same principle in *Zellers v. White*, describing the statute as one "calculated to make its gains unavailing to the winner, and to remove… the incentive to play." 208 Ill. 518, 526–27 (1904). The Seventh Circuit has adopted that understanding, holding that § 28-8(b) "was intended to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism." *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997).

Defendant's attempt to recast the purpose of the Illinois Loss Recovery Act as compensatory—focused on protecting gamblers and their families—is contrary to controlling Illinois authority. The Illinois Supreme Court has long held that the statute is designed to "mulct the winner in the loss of his gains" and to remove the incentive to gamble.

Illinois courts have interpreted the statutory language as imposing a six-month statute of limitations on the loser's right to recover under § 28-8(a).*See Kizer v. Walden*, 198 Ill. 274 (Ill. 1902) (holding gambling statute with nearly identical language imposed a 6-month statute of

---

[4]     Defendant's repeated references to the "Statute of Anne" are rhetorical and of no legal significance. Illinois has codified and repeatedly enforced and amended the Loss Recovery Act (including to cover Sports Wagering and internet gambling), and courts—including the Illinois Supreme Court and Seventh Circuit—have consistently recognized its continuing force. Defendant's attempt to portray the action as archaic is a red herring.

6

limitations on the loser's right to initiate a private cause of action to recover the money paid); *see also Bartlett v. Slusher*, 215 Ill. 348, 74 N.E. 370 (Ill. 1905); *Holland v. Swain*, 94 Ill. 154 (Ill. 1879); *Moench v. Graff*, 212 Ill. App. 42 (Ill. App. 3rd Dist. 1918). If the loser does not sue within six months of payment of any part of the loss, then their claim is extinguished, as barred by the statute of limitations. Upon expiration of that period, the right to sue accrues to "any other person. "As explained in *Moench v. Graff*: "in case the party who shall lose shall not within six months sue for and recover such money or other thing lost, then it shall be lawful for any other person to sue for and recover from the winner treble the value of the money or other valuable thing lost or delivered." 212 Ill. App. at 46.

Knowing this, Kalshi's argument that Plaintiff must plead Adhi's "claim" with granular specificity collapses. Section 28-8(b) does not create a derivative cause of action dependent on the continued viability of the loser's claim; it creates a new and independent right that arises by operation of law once the loser fails to sue within six months. The statutory text is unambiguous: "any person may initiate a civil action against the winner." 720 ILCS 5/28-8(b). Per the cases cited above, Illinois courts have consistently interpreted that language as creating an independent enforcement right rather than a transferred claim. The right accrues at the expiration of the six-month period; it does not depend on stepping into the loser's shoes. Kalshi's contrary theory would rewrite the statute to impose a derivative standing requirement that does not exist. There is no "shoe stepping." Defendant's proposed purpose—protecting gamblers and their families—cannot be reconciled with the statute's express authorization allowing "any person" to bring suit after six months. That provision reflects a broader enforcement objective, not a narrow compensatory one.

That doctrinal error infects Kalshi's pleading argument as well. Because the statute is penal and directed at the conduct of the winner, the adequacy of the complaint does not turn on a

7

transaction-by-transaction accounting of each loss. The Supreme Court has made clear that where remedies are punitive in nature, the focus "be upon the specific conduct of the person from whom the… forfeitures" are sought. *United States v. Bornstein*, 423 U.S. 303, 313 (1976) (superseded by statute on other grounds as stated in *U.S. ex rel. Stevens v. McGinnis, Inc.*, 1994 U.S. Dist. LEXIS 20953, *17, n. 37 (S.D. Ohio 1994); see also *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) (penal remedies are intended "to punish past, and to deter future, unlawful conduct"). That principle applies with full force here. The LRA does not require a relator to plead a ledger of every wager or identification of every losing participant by name. It requires allegations of unlawful gambling, a winner, and the failure of the loser to sue within the statutory timeframe. Plaintiff has done exactly that.

Illinois courts have rejected attempts to convert the LRA into a heightened pleading regime. In *Webb v. Iaderosa*, the court reversed dismissal where the relator alleged the existence of wagers, the amounts involved, and the parties, holding that such allegations were sufficient to state a claim. 2020 IL App (3d) 180609. The Illinois Supreme Court has likewise recognized that practical difficulties in identifying participants—particularly in internet-based wagering—do not limit the statute's reach, and that discovery may be used to obtain identifying information where necessary. *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 16. Kalshi's insistence on transaction-level detail at the pleading stage finds no support in Illinois law; it is an attempt to impose an evidentiary burden before discovery has begun.

Kalshi's argument that it is not a "winner" fares no better, because it depends on resolving a disputed factual characterization in its own favor. Illinois law has long rejected formalistic attempts to avoid LRA liability by restructuring the mechanics of wagering transactions. In *Zellers*, the defendant argued, like Kalshi here, that he was not the winner because intermediaries handled

8

the wagers and winnings passed through multiple hands. The Illinois Supreme Court rejected that argument outright, holding that "[w]hat Zellers did by another… he did by himself," and that the plaintiff could "sue the agent or the principal, at his election." 208 Ill. at 524. The Court refused to allow the defendant to escape liability by fragmenting the transaction into discrete components. The same reasoning applies here. Where the complaint alleges that the defendant operates the wagering mechanism, structures the transactions, and profits from them, the question whether the defendant is the "winner" is one of substance, not labels.

That principle has particular force in cases involving modern, platform-mediated wagering. In *Webb*, the court distinguished *Dew-Becker* and allowed an LRA claim to proceed where the defendants allegedly operated and controlled the website through which wagers were placed, even though the transactions occurred through an online platform. 2020 IL App (3d) 180609, ¶ 15. The court recognized that control and economic reality, not formal labels, govern the analysis. Kalshi's argument repackages the same rejected theory: that by calling itself an "exchange" or "facilitator," it can avoid being treated as the entity that reaps the gains (i.e. the "winner") of the wagering system it controls and operates. At the pleading stage, where all reasonable inferences must be drawn in Plaintiff's favor, Defendant's argument cannot support dismissal.

Nor can Kalshi rely on the statutory proviso for a "regular board of trade or commercial exchange" to obtain dismissal. It is well settled that "the burden of proving justification or exemption under a statutory exception rests on the one who claims its benefits." *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 711 (2001). Kalshi cannot convert that affirmative defense into a pleading requirement imposed on Plaintiff. More fundamentally, the applicability of the exemption turns on the very issue in dispute: whether Kalshi's activities constitute lawful exchange trading or unlawful gambling. That is a merits question requiring factual development.

**IV.     The Kentucky Loss Recovery Act Supports Plaintiff's Claim.**

The Kentucky Supreme Court's decision in *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792 (S. Ct. Ky. 2020) confirms the core principles underlying Plaintiff's claim. There, the court rejected arguments materially identical to those Defendant advances here—namely, that loss recovery statutes are narrow, derivative, and inapplicable to platform operators.

First, *Brown* confirms that such statutes confer broad standing. Like the Illinois statute, Kentucky law provides that if the loser does not sue within six months, "any other person" may bring suit. The Kentucky Supreme Court held that this language must be given its plain and expansive meaning, extending standing broadly rather than narrowly. That interpretation forecloses Defendant's attempt to impose extra-textual limitations on who may sue.

Second, *Brown* confirms that these claims are not derivative. The court held that once the statutory period expires, the right to sue vests independently in "any other person," reflecting a deterrence-based enforcement scheme rather than a transfer of the loser's claim.

Third, *Brown* squarely rejected the argument that a platform operator cannot qualify as a "winner." The court held that an entity that takes a percentage of wagering activity has a sufficient economic interest in the proceeds to be treated as a statutory winner, even if it does not directly participate as a bettor. That functional approach applies with equal force here, where Plaintiff alleges that Defendant profits from and operates the wagering system. *Triplett v. Seelbach*, 14 S.W. 948, 949 (Ky. App. 1890) (holding that one who takes a percentage of wagers is a statutory "winner" and joint wrongdoer, because any party with a "community of interest" in the proceeds of unlawful gambling shares responsibility for the entire loss).

10

Finally, *Brown* rejected the very pleading argument Defendant advances here. The court held that plaintiffs are not required to identify each wager, participant, or transaction at the pleading stage, and that general allegations are sufficient where the defendant controls the relevant information. In sum, *Brown* confirms that loss recovery statutes: (1) grant standing broadly to "any person;" (2) create independent enforcement rights; (3) define "winner" functionally to include those who profit from wagering activity; and (4) do not impose heightened pleading requirements. Each of those principles directly supports Plaintiff's claim and undermines Defendant's motion.

## V.     The State Statutes Apply to the Alleged Conduct.

For the same reasons that Plaintiff states a claim under Illinois law (Count I) and Kentucky law (Count III), Plaintiff states a claim under the laws of Ohio and Massachusetts. The Loss Recovery Acts are similar in all four states. Moreover, the nature of Defendant's alleged nationwide virtual gambling hall – with no geofencing – and the offering of interstate, nationwide, gambling subjects Defendant to liability.

Defendant's argument rests on the erroneous premise that the Complaint seeks to apply state law to wholly out-of-state conduct. It does not. The Complaint alleges that Defendant operates an online wagering platform accessible in Illinois and other states and affirmatively chooses not to geofence those jurisdictions, thereby enabling users to place wagers and incur losses within those states.

At the outset, Defendant's argument depends on factual assertions outside the Complaint—regarding where transactions occurred, where users were located, and how the platform operates—that cannot be credited on a motion to dismiss. The Complaint alleges that users, including Adhi, placed wagers on Defendant's platform and incurred losses exceeding statutory thresholds, and

11

that Defendant made that platform available to users in the relevant states. At this stage, those allegations must be accepted as true and all reasonable inferences drawn in Plaintiff's favor.

Defendant's reliance on extraterritoriality principles is misplaced. This is not a case involving purely localized, out-of-state conduct of the type addressed in *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010), or similar authorities. Those cases involved discrete, physical transactions occurring entirely within a single jurisdiction. Here, by contrast, the Complaint alleges an internet-based wagering platform that operates across state lines and permits users to engage in transactions from within Illinois and other states. In that context, the relevant conduct occurs where the user is located when placing wagers and incurring losses. Defendant's attempt to analogize this case to wholly out-of-state transactions ignores the realities of modern, platform-mediated activity.

Nor is Plaintiff required to plead transaction-level geographic detail at the outset of the case. Rule 8 does not require a plaintiff to identify the precise location, timing, or mechanics of each individual transaction, particularly where that information is uniquely within Defendant's possession and control. The Complaint alleges that Defendant made its platform available in the relevant states, that users placed wagers through that platform, and that those wagers resulted in losses exceeding statutory thresholds. That is sufficient to plausibly allege that the conduct at issue occurred within the jurisdictions whose statutes Plaintiff invokes. To the extent Defendant disputes where particular transactions occurred, that presents a factual issue inappropriate for resolution on a motion to dismiss.

Defendant's argument also fails because it disregards the Complaint's allegations regarding purposeful access to the relevant states. The Complaint alleges that Defendant intentionally chose not to geofence Illinois, Ohio, Kentucky, and Massachusetts, despite knowing

12

that users in those jurisdictions could access and use its platform. Those allegations plausibly establish that Defendant availed itself of those markets and facilitated wagering activity within them. Having done so, Defendant cannot avoid the application of those states' laws by characterizing its conduct as occurring "elsewhere." Even if there were uncertainty as to the applicability of statutes from multiple jurisdictions, that would not warrant dismissal, but simply discovery.

## VI. Defendant's Preemption Defense Fails.

First, Defendant's preemption defense fails because Kalshi, Inc. is not a designated contract market ("DCM") – KalshiEX LLC is. This is one of the reasons Plaintiff sued Kalshi, Inc. (as a "winner") but not KashiEx LLC (a DCM). Plaintiff intentionally crafted the Complaint to avoid the anticipated preemption argument. But, apart from that, preemption does not apply.

Defendant's motion asks this Court to do something Congress never said, the Commodity Exchange Act does not require, and *Murphy* forbids by implication: strip Illinois of its ordinary police-power authority over gambling because a private entity chose to route sports wagering through a federally regulated platform and call the wagers "swaps." That theory fails at every level. It fails textually because the CEA does not expressly preempt state gambling law and, in fact, preserves state authority in multiple places. It fails structurally because the statute's "special rule" for event contracts expressly incorporates state-law illegality rather than displacing it. It fails doctrinally because the field Defendant posits is defined far too broadly and because these supposed sports-outcome contracts are not "swaps" within the meaning of the Act – they are sports wagering plain and simple. It fails practically because Defendant's reading has no limiting principle and would federalize vast swaths of ordinary wagering and consumer conduct. And it fails constitutionally because, under *Murphy v. NCAA*, 584 U.S. 453 (2018), Congress may not

13

accomplish through a preemption label what amounts to a command that States stand down in an area, sports gambling regulation, that lies at the heart of their police power. Moreover, preemption is an affirmative defense that is not properly resolvable on a rule 12 motion (unless it appears from the face of the complaint, which it does not).

> **A.** ***Murphy*, not Defendant's abstraction of "derivatives markets," supplies the proper starting point.**

Defendant's preemption theory raises serious constitutional concerns *under Murphy v. NCAA,* 584 U.S. 453 (2018), and therefore cannot be resolved on a motion to dismiss. *Murphy* makes clear that Congress may preempt state law only by regulating private actors, not by dictating what States may or may not regulate. *Id.* at 478–80. Laws that "unequivocally dictate what a state legislature may and may not do" violate the anti-commandeering doctrine. *Id.*

Defendant's theory pushes against that boundary. It would prevent Illinois from enforcing its gambling laws—an area at the core of state police power—based solely on the assertion that a private exchange has labeled wagers as "swaps" and routed them through a federally regulated platform. That is not ordinary preemption. At a minimum, it raises substantial questions about whether Defendant's interpretation impermissibly displaces state authority without a clear congressional command.

Defendant's argument also depends on framing this case at an impermissibly high level of abstraction. It characterizes the dispute as one about "derivatives markets" and "exclusive jurisdiction," but the Complaint alleges something more concrete: wagers on sports and other contingent outcomes offered to users within the States. The relevant question is not whether Congress regulates derivatives markets in general, but whether it clearly and manifestly intended to displace state gambling law in this context. See *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605 (1991).

14

Courts confronting similar arguments have rejected that framing. In *KalshiEX LLC v. Martin*, 2025 WL 2194908, at \*5–13 (D. Md. Aug. 1, 2025), the court held that the presumption against preemption applies because the conduct at issue is gambling, a field traditionally occupied by the States. Likewise, recent decisions have questioned whether such contracts fall within the CEA's core regulatory scope at all. *See, e.g.*, *KalshiEX LLC v. Hendrick*, 2025 WL 1073495 (D. Nev. Apr. 9, 2025).

**B.      There is no express preemption.**

Defendant's express-preemption theory is foreclosed by the Seventh Circuit's own reading of the CEA. In *American Agriculture Movement v. Chicago Board of Trade*, the court stated plainly: "No one suggests that the CEA expressly preempts state law." 977 F.2d 1147, 1156 (7th Cir. 1992). That should end the matter.

The statutory text confirms the same point. Section 2(a)(1)(A) grants the CFTC "exclusive jurisdiction" over certain transactions on designated markets, but immediately provides that, "[e]xcept as hereinabove provided," nothing in the section supersedes or limits the jurisdiction of state or federal authorities or courts. The Seventh Circuit has held that these provisions "can be harmonized." *American Agricultural Movement*, 977 F.2d at 1156. Properly read, the statute allocates regulatory authority over market operations; it does not expressly extinguish all state law touching conduct that a defendant characterizes as a derivative transaction.

Defendant's reliance on general "exclusive jurisdiction" cases does not alter that conclusion. Authorities such as *Mississippi v. Louisiana*, *Transcontinental Gas*, and *de la Cuesta* address the general proposition that federal law may preempt conflicting state law. They do not interpret the CEA, its savings language, or its treatment of state-law illegality, nor do they address the application of state gambling law in this context.

### C.     There is no field preemption

Field preemption requires precision. Defendant's theory fails because it grossly exaggerates the reach of the CEA and mischaracterizes what Congress meant by granting the CFTC "exclusive jurisdiction." Under the CEA, Congress preempted only the field of futures trading on lawfully listed derivatives that actually fall within the statute—not any product an exchange unilaterally decides to label a "derivative," and certainly not state gambling or consumer-protection laws applied outside the statute's core. Section 2(a)(1)(A) grants exclusive jurisdiction over federally regulated futures and swaps; it does not occupy the entire field of "event contracts," wagers, or agreements contingent on future occurrences. Such a view would lead to absurd results—for example, allowing ordinary consumer contracts or insurance products to be swept into federal jurisdiction simply by routing them through a DCM. Field preemption requires an identifiable portion Congress intended to occupy, and here that portion is commodity futures—more specifically, "swaps"—not nonfinancial wagering activity. If the contracts at issue are not swaps—and as shown below, they are not—there can be no preemption, field or otherwise.

The actual field the CEA occupies is the regulation of commodity futures and related financial derivatives markets. Courts have recognized as much. In *KalshiEX LLC v. Martin*, the court emphasized that Congress did not clearly and manifestly intend to preempt state sports-betting laws. Likewise, *American Agricultural Movement v. Board of Trade of Chicago* limited preemption to state laws that "directly affect trading on or the operation of a futures market." Defendant's theory would allow private exchanges to define the scope of federal preemption unilaterally—simply by listing wagers and labeling them swaps. Nothing in the Act suggests Congress delegated that power to private actors.

16

Defendant's authorities do not establish the broader field it proposes. Cases such as *Leist*, *Curran*, *CME v. SEC*, *Saul Stone* v. *Browning* address the structure of federal commodities regulation—often in relation to the SEC or private rights of action—not the preemption of state gambling law. *Pettigrew* and *Conaway* arose in a different era and addressed traditional commodity futures and bucket-shop regulation, not Dodd-Frank's treatment of swaps, the special rule for event contracts, § 40.11's gaming prohibition, or the federalism concerns recognized in *Murphy*. None stands for the proposition Defendant needs here: that Congress meant to occupy the field of sports wagering whenever a DCM is involved.

Defendant's contention that a Title Event Contract constitutes a "swap" under 7 U.S.C. § 1a(47)(A)(ii) disregards both statutory structure and the established derivatives framework underlying the CEA. Courts and regulators consistently define swaps as financial derivatives—contracts whose value derives from movements in underlying prices, rates, yields, or indices and whose economic function is the transfer or hedging of market or credit risk between counterparties. *See*, *e.g.*, *Sec. Indus. & Fin. Mkts. Ass'n v. CFTC*, 67 F. Supp. 3d 373, 381 (D.D.C. 2014); *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *1–2 (D.D.C. Sept. 12, 2024).

*Martin*'s analysis is especially instructive because it shows why Defendant's proposed field is illogical. A statute that incorporates state-law illegality into federal review is not naturally read as displacing all such law. As *Martin* observed, where federal law expressly incorporates state law, preemption analysis is fundamentally altered because Congress has left room for state regulation. That principle is fatal to Defendant's claim that Congress occupied the field so completely that state sports-wagering law has no role to play.

17

### 1. The statute's special rule and the gaming prohibition affirmatively preserve, rather than extinguish, state gambling law.

The provision Defendant most needs this Court to overlook is 7 U.S.C. § 7a-2(c)(5)(C), the "special rule" governing event contracts. That rule says exactly what one would expect if Congress intended to preserve state interests in this area. It authorizes the Commission to determine whether a contract based on the occurrence of certain events is contrary to the public interest, including where it involves "gaming" or "activity that is unlawful under any Federal or State law." If so, the contract may not be listed or made available on a registered entity. In other words, the statute does not treat state unlawfulness as irrelevant—it uses it as a trigger for federal scrutiny.

As *Martin* recognized, this structure is irreconcilable with Defendant's broad preemption theory. If state gambling laws were nullified whenever a DCM offers a wager, the statute's reference to conduct "unlawful under any Federal or State law" would be meaningless. The same is true of the statute's explicit reference to "gaming." That is not the language of a statute indifferent to gambling regulation; it reflects a congressional judgment that such activity may render an event contract improper for listing on a federally regulated exchange.

The implementing regulation reinforces the point. Section 40.11(a) prohibits registered entities from listing or clearing contracts involving "gaming" or activity unlawful under state or federal law. That prohibition is categorical on its face, even if § 40.11(c) provides a review mechanism for contracts that have nonetheless been listed. Defendant's theory depends on treating this rule as either irrelevant or toothless. Courts have refused to do so. Recent decisions have relied on § 40.11 and the statutory special rule as evidence that Congress and the Commission did not intend DCMs to become nationwide gambling venues. As one court explained, the CFTC's gaming prohibition reflects a congressional intent "to prevent gambling through futures markets," not to federalize it.

18

### 2. Defendant cannot show field preemption because these contracts are not "swaps."

Defendant faces a threshold problem: § 2(a)(1)(A)'s exclusive-jurisdiction clause applies only if the transactions are "swaps or contracts of sale of a commodity for future delivery." Defendant assumes that conclusion. But courts are fully capable of interpreting the statute, and self-certification does not transform a sports wager into a swap.

The best recent discussion appears in Judge Gordon's Crypto opinion, later reinforced in the dissolved *Hendrick* order. Beginning with the text, the court explained that § 1a(47)(A)(ii) covers agreements tied to the occurrence of an "event or contingency." But in ordinary usage, the sporting event is the "event"—its outcome is not. As the court observed, the Kentucky Derby is an event; who wins it is an outcome of that event, not a separate event in itself. Defendant's contracts turn on outcomes, not events. They are wagers on results, not contracts on the occurrence or nonoccurrence of the event itself. The court also explained that Defendant's reading lacks any limiting principle. If "event" includes every outcome, micro-event, or future contingency, the statute would sweep in ordinary betting markets and countless consumer arrangements never understood as swaps. That interpretation violates basic canons against surplusage and absurd results. The *Hendrick* order further clarified that the requirement of a "potential financial, economic, or commercial consequence" cannot be satisfied by speculative downstream effects; otherwise, virtually any agreement would qualify.

This conclusion is reinforced by the statute's broader structure. The surrounding definitions address classic financial instruments—interest rates, currencies, securities, indices, and credit risk. The unifying feature is financial-risk transfer. Section 1a(47)(A)(ii) cannot be read in isolation to detach event-based language from that framework and thereby federalize every agreement dependent on a future fact. As courts have recognized, derivatives are instruments whose value

derives from underlying assets and are used to transfer market or credit risk—not to facilitate consumer wagering.

The Commissions' 2012 Product Definitions rule confirms this limited reading. The Commissions warned against an "unbounded" interpretation that would capture "customary consumer and commercial arrangements," emphasizing that Congress did not intend such transactions to become swaps merely because payment depends on a future contingency. Sports wagering is the paradigmatic consumer transaction—not a financial derivative.

The CFTC's pre-Dodd-Frank guidance points in the same direction. The 2008 Concept Release explained that event contracts tied to elections, entertainment, or sports outcomes are not derivatives because they do not derive from market prices or broader economic activity. Defendant's theory would erase that distinction and transform ordinary wagers into federally regulated financial instruments. The practical consequences confirm the error. If Defendant were correct, most sports wagering would have to occur on DCMs, rendering existing casinos, sportsbooks, and bettors noncompliant with federal law. Congress "surely would have said so" had it intended such a transformation. It did not.

### 3. "Excluded commodities" does not save Defendant's motion.

The dissolved *Hendrick* order exposed a second defect in Defendant's theory: even if these products could be characterized as "excluded commodities," that would not establish exclusive jurisdiction under § 2(a)(1)(A). That provision grants exclusive jurisdiction over transactions involving swaps or contracts of sale of a commodity for future delivery—not over excluded commodities as such. As Judge Gordon explained, the statute does not extend exclusivity to excluded commodities generally, and that omission matters. Congress knew how to refer to

excluded commodities elsewhere, including in the special rule and in § 40.11's implementation. Its absence here is not accidental.

Defendant's argument blurs three distinct concepts: products the CFTC may regulate, products that qualify as swaps, and products that trigger exclusive federal jurisdiction. Those categories are not coextensive. As the *Hendrick* order recognized, the CFTC may regulate DCMs under § 7(d)(1) even where a listed product does not fall within § 2(a)'s exclusive jurisdiction. Recognizing that distinction does not undermine the Commission's authority—it simply confines exclusivity to what the statute actually provides.

### D. There is no conflict preemption.

Defendant's obstacle-preemption argument is just field preemption in different clothes. It says Illinois law frustrates national uniformity, interferes with the orderly operation of designated markets, and upsets the Commission's regulatory choices. But there is no federal objective of guaranteeing nationwide sports betting on DCMs. Quite the contrary: the text, the special rule, and the gaming prohibition show that Congress and the Commission were worried about gambling entering futures markets. State enforcement against sports wagering therefore does not frustrate federal objectives; it reinforces them.

Nor is simultaneous compliance impossible. Defendant can comply with federal law and Illinois law at the same time by refraining from offering unlicensed sports wagers in Illinois or by obtaining whatever state authorization Illinois requires. Nothing in the CEA requires Defendant to offer sports-outcome contracts in every State. The later Nevada orders were especially good on this point in practical terms: if a DCM chooses to geofence, pause listings, or otherwise comply with state law while the litigation unfolds, there is no evidence the CFTC will strip its designation. Indeed, market participants have done precisely that.

The uniformity rhetoric also proves too much. Every federal regulatory regime can generate some desire for national uniformity. But obstacle preemption is not a license to turn that desire into a roving nullification of state police powers, especially where Congress built state-law triggers into the statute itself. If a federal statute expressly contemplates that state law may make an activity unlawful and thereby affect whether a product is contrary to the public interest, it is hard to say with a straight face that the mere application of state law is an obstacle to the federal scheme. Here, the supposed obstacle is not an accident of overlap; it is something Congress expressly accounted for.

### E. Defendant's APA and Deference Arguments Are Meritless

Defendant suggests that courts should not determine whether a listed product qualifies as a "swap," and that such questions must instead be resolved through an APA challenge to final agency action. That argument fails. Courts routinely interpret federal statutes in resolving preemption questions, and the existence of agency review authority does not displace that role. Nor is there any final agency action here to which Defendant can point. The CFTC has acknowledged that these contracts were listed through self-certification and has not determined whether they involve prohibited activity under § 7a-2(c)(5)(C)(i) or § 40.11(a). If anything, that makes Defendant's request for judicial deference weaker, not stronger.

As the dissolved *Hendrick* order put it, Defendant's APA theory "puts the cart before the horse." Before one can conclude that state law is preempted by the CFTC's exclusive jurisdiction, one must first determine whether the conduct at issue falls within that jurisdiction. DCM cannot insulate itself from state law simply by filing paperwork and hoping the Commission does not intervene. If the product does not fall within § 2(a)(1)(A), exclusivity never attaches.

22

**F.** **The Third Circuit's Preliminary Injunction Decision Does Not Support Dismissal**

Defendant will likely point to the Third Circuit's recent decision in *KalshiEX LLC v. Flaherty,* 2026 U.S. App. LEXIS 9948 (3rd Cir. 2026), where a divided court affirmed a preliminary injunction under a deferential standard. There, the Court held only that Kalshi had shown a "reasonable chance of success" on its preemption argument; not that it would ultimately prevail. The court emphasized that "reasonable" in this context does not mean "more likely than not," but merely "significantly better than negligible." *Id.* at * 6. That limited holding falls far short of resolving the merits of the preemption question. Just as importantly, the Third Circuit expressly declined to address the broader issue central to this case, i.e., whether the Commodity Exchange Act displaces state gambling law more generally. *Id.* at *12, n. 2 ("We need not address… whether the Act preempts all state gambling regulation.").

The decision therefore leaves untouched the core arguments presented in this case: that the statutory structure, including the special rule for event contracts and the Commission's gaming prohibition, incorporates rather than displaces state law; that the scope of any preempted "field" must be defined with precision; and that whether these contracts qualify as "swaps" is itself a disputed legal question not resolved on the pleadings. At most, the Third Circuit's decision confirms that these issues are actively contested and far from settled. That alone precludes dismissal at the pleading stage.

**G.** **At minimum, preemption cannot be resolved on a motion to dismiss.**

Even if the Court were not prepared to reject Defendant's preemption defense outright, dismissal would still be improper. Defendant's position turns on factual determinations, regulatory context, and legal characterizations that cannot be resolved cleanly on the pleadings. Among other things, the Court would need to assess the precise nature of the products, the content and effect of

the self-certification, the role of state law in defining the alleged unlawfulness, the relation between the products and the statutory definition of "swap," and the regulatory history that informs the meaning of "gaming," "event," and "financial consequence." That is too much for a Rule 12 dismissal, especially where preemption is an affirmative defense with a presumption against it.

The later Nevada opinions themselves underscore that the area is "novel and evolving." If federal courts considering developed preliminary-injunction records, extensive briefing, and multiple rounds of argument have needed to parse these questions at length—and have reversed themselves as the law developed—it would be especially inappropriate to dispose of Plaintiff's claims here on the pleadings. Defendant wants a sweeping ruling that Illinois cannot apply its gambling and revenue laws to sports wagering conducted through a DCM. That is not the sort of issue to be granted on thin assumptions and abstractions. It is a demanding defense, and Defendant has not carried the burden.

### H. Defendant's cases, properly read, either do not apply or support Plaintiff's position.

One final point bears emphasis. Defendant's brief tries to create the impression that the broader body of preemption law is on its side. It is not. *American Agricultural Movement* hurts Defendant, because it says there is no express preemption and confines implied preemption to state laws that directly affect trading on or the operation of a futures market. Illinois's application of its gambling, licensing, and tax laws to disguised sports wagering does not regulate commodities-market mechanics; it regulates wagering conduct and the avoidance of state obligations. *Curran* hurts Defendant too, because although it recognizes the CEA as a comprehensive regulatory statute, Martin correctly cites it for a narrower proposition: the CEA oversees the futures trading complex, not all gambling or all event prediction. *Martin's* use of *Curran* is telling because it shows how the same case can support federal market regulation without implying a displacement

of state sports-wagering law. The generic Supremacy Clause cases—*Crosby*, *Arizona*, *Whiting*, *de la Cuesta*—add nothing unless Defendant first proves the substantive premise that the CEA actually reaches these contracts and actually displaces state law here. They are about preemption method, not the meaning of this statute.

*Pettigrew*, *Rice v. Board of Trade* and similar commodities cases arose in very different statutory and historical contexts. None dealt with Dodd-Frank's special rule, the CFTC's gaming regulation, or *Murphy*. None involved a State applying its sports-wagering law to online sports-outcome bets routed through a DCM. Those cases therefore do not decide this one. And the early district court wins Defendant invokes are now materially weakened by subsequent authority. *Hendrick* was dissolved. *Flaherty* relied on reasoning later rejected elsewhere. *Martin* denied relief. *Crypto* denied relief. The trendline is against Defendant.

The Court should reject Defendant's preemption defense for a simple reason that becomes clearer the longer one studies the statute: Congress regulated financial derivatives; it did not silently nationalize sports gambling. *Murphy* puts the federalism point in the foreground. *American Agricultural Movement* forecloses express preemption. The special rule and § 40.11 confirm that Congress and the Commission were concerned with gaming, not committed to protecting it from state law. *Martin* explains why the presumption against preemption applies in full force. Crypto and the dissolved *Hendrick* order explain why these sports-outcome contracts are not swaps and why Defendant's reading has no limiting principle. And your own prior brief captures the practical and constitutional defect as well as anyone has: Defendant's theory would let private exchanges "erase state law simply by listing wagers and calling them derivatives." The CEA does not authorize that result, and this Court should not be the one to invent it.

WHEREFORE, Defendant's motion should be denied.

25

Respectfully Submitted,
MARK T. LAVERY

/s/ Christopher V. Langone
By: His Attorney
Christoher V. Langone

205 N. Michigan #805
Chicago, IL 60602
(312) 720-9191
LangoneLaw@gmail,com