**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARK T. LAVERY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 25 C 14184 |
| | ) | |
| v. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| KALSHI INC.; KALSHIEX LLC;<br>KALSHI TRADING LLC; and<br>KALSHI KLEAR LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE A RESPONSE BRIEF EXCEEDING FIFTEEN PAGES**

Plaintiff Mark T. Lavery respectfully moves for leave to file a memorandum in opposition to the Kalshi Defendants' Motion to Dismiss the First Amended Complaint [Dkt. 41] that exceeds the fifteen-page limit of Local Rule 7.1. In support, Plaintiff states:

1. Defendants filed a 24-page memorandum in support of their motion [Dkt. 41], which seeks dismissal on four independent grounds, including federal preemption.

2. Plaintiff requests leave to file a response of 25 pages, exclusive of the cover page and the tables of contents and authorities, so that he may address each ground Defendants raise.

3. This motion is made in good faith and not for purposes of delay, and no party will be prejudiced.

WHEREFORE, Plaintiff respectfully requests that the Court grant him leave to file a memorandum in opposition to Defendants' Motion to Dismiss not to exceed 25 pages, exclusive of the cover page and tables.

Dated: October 5, 2026

Respectfully submitted,
MARK T. LAVERY, Plaintiff

By: /s/ Christopher V. Langone
One of his attorneys

Christopher V. Langone
LANGONE LAW LLC
205 N. Michigan Avenue, Suite 810
Chicago, Illinois 60601
(312) 720-9191
langonelaw@gmail.com

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARK T. LAVERY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 25 C 14184 |
| | ) | |
| v. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| KALSHI INC.; KALSHIEX LLC; | ) | |
| KALSHI TRADING LLC; and | ) | |
| KALSHI KLEAR LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE KALSHI DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Christopher V. Langone
LANGONE LAW LLC
205 N. Michigan Avenue, Suite 810
Chicago, Illinois 60601
(312) 720-9191
langonelaw@gmail.com

# TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ..... 1

STANDARD OF REVIEW ..... 3

ARGUMENT ..... 4

I. ZELLERS CONTROLS: A HOUSE THAT EMPLOYS GAMBLERS TO PLAY FOR THE HOUSE IS THE "WINNER." ..... 4

A. The FAC alleges the same house-player structure as *Zellers*, but in modern form. ..... 5

B. *Pearce v. Foote* confirms that a direct counterparty is the winner even if the money moves to others. ..... 6

C. *Reuter*, *Sonnenberg*, and *Phillips* (the "Facilitator Cases") support, rather than defeat, the house-played theory. ..... 7

D. All Kalshi Entities may be pleaded as "winners" to the extent they are principals, agents, or beneficial owners of the house-side gaming gain. ..... 8

E. The statutory exchange exclusion is an affirmative defense Kalshi has not raised, and it does not defeat the *Zellers* theory on the pleadings. ..... 9

II. COUNT I STATES A CLAIM UNDER THE ILLINOIS LOSS RECOVERY ACT ..... 12

A. The FAC pleads the six-month element; the exact loss dates are in Kalshi's exclusive records. ..... 12

B. The FAC pleads a statutory "winner"—Kalshi Trading LLC, the proprietary counterparty that keeps the loser's money. ..... 13

C. Kalshi's "double recovery" policy argument contradicts both the statute and the FAC. ..... 16

D. Plaintiff does not stand in the losers' shoes; the section 28-8(b) right is his own. ..... 17

III. THE COURT MAY EXERCISE PENDENT PERSONAL JURISDICTION OVER COUNTS II THROUGH IV. ..... 19

IV. COUNTS II THROUGH IV STATE CLAIMS, OR AT MINIMUM WARRANT LEAVE TO AMEND. ..... 20

V. FEDERAL PREEMPTION CANNOT BE DECIDED ON THIS MOTION AND DOES NOT BAR THESE CLAIMS. ..... 21

A. Preemption is an affirmative defense that must appear on the face of the complaint—and does not. ..... 21

B. Two courts of appeals have rejected Kalshi's premise that these are federally authorized swaps. ..... 22

C. A backward-looking loss-recovery remedy is neither field- nor conflict-preempted. .......... 23

VI. IN THE ALTERNATIVE, THE COURT SHOULD GRANT LEAVE TO AMEND RATHER THAN DISMISS WITH PREJUDICE. .......... 24

CONCLUSION .......... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014) ..... 2

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948 (8th Cir. 2023) ..... 3, 12

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147 (7th Cir. 1992) ..... 22, 23

*Anderson v. Naperville Rotary Charities Inc.*, 2019 IL App (1st) 180312-U ..... 15

*Arista Recs. LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ..... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..... 3

*Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010) ..... 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..... 3, 12

*Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017) ..... 19

*Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610 (7th Cir. 2014) ..... 11, 21

*Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792 (Ky. 2020) ..... 20

*Flaherty v. KalshiEX, LLC*, No. 26-299 (U.S. petition docketed Sept. 8, 2026) ..... 3

*FTC v. Morton Salt Co.*, 334 U.S. 37 (1948) ..... 11

*Javierre v. Central Altagracia*, 217 U.S. 502 (1910) ..... 11

*KalshiEX, LLC v. Assad*, No. 25-7516, 2026 U.S. App. LEXIS 26395 (9th Cir. Aug. 28, 2026) ..... 3, 15, 22, 23

*KalshiEx, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026) ..... 3, 23

*KalshiEX LLC v. Schuler*, Nos. 26-3196/26-5235, 2026 U.S. App. LEXIS 29542 (6th Cir. Sept. 25, 2026) ..... 3, 22, 23

*Kizer v. Walden*, 198 Ill. 274 (1902) ..... 13, 16, 17, 18

*Langone v. Kaiser*, No. 12 C 2073, 2013 WL 5567587 (N.D. Ill. Oct. 9, 2013) ..... 15

*Lavery v. Kalshi Inc.*, No. 25 C 14184, 2026 WL 2018471 (N.D. Ill. July 13, 2026) [Dkt. 37] ..... 4, 13, 16, 18

*Lawson v. Iaderosa*, 2020 IL App (3d) 180609 ..... 15

*Lequat v. People*, 11 Ill. 330 ..... 10

*Liu v. Monthly*, 170 F.4th 1090 (7th Cir. 2026) ..... 2

*Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84 (2008) ..... 11

*Pearce v. Foote*, 113 Ill. 228 (1885) ..... 1, 2, 6, 7, 8, 10, 11, 13, 14

*People v. Butler*, 268 Ill. 635 (1915) .......... 10

*Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731 (N.D. Ill. 2016) .......... 7, 8

*Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915 (2010) .......... 2, 5, 7, 9

*Robinson Eng'g Co. Pension Plan & Tr. v. George*, 223 F.3d 445 (7th Cir. 2000) .......... 19

*Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509 (7th Cir. 2016).. 7, 12, 13, 14, 15, 19

*Vanegas v. Signet Builders, Inc.*, 113 F.4th 718 (7th Cir. 2024) .......... 19

*Vinson v. Casino Queen, Inc.*, 123 F.3d 655 (7th Cir. 1997) .......... 17

*Zellers v. White*, 208 Ill. 518 (1904) .......... 1, 2, 4, 5, 6, 7, 8, 9, 12, 13

**Statutes**

31 U.S.C. § 5362(1)(E)(ii) .......... 23

7 U.S.C. § 2(a)(1)(A) .......... 22

720 ILCS 5/28-8 .......... 6, 9, 10, 12, 13, 16, 17, 18

Mass. Gen. Laws ch. 23K .......... 20

O.C.G.A. § 13-8-3(b) .......... 21

**Rules and Regulations**

17 C.F.R. § 40.11 .......... 22

Fed. R. Civ. P. 12(b)(6) .......... 3, 23

Fed. R. Civ. P. 12(d) .......... 21

Fed. R. Civ. P. 15(a)(2) .......... 24

Fed. R. Civ. P. 41(b) .......... 19

**Other Authorities**

22 Cyc. 344 .......... 10

Brief for Appellee, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. 2024) .......... 21

## INTRODUCTION

Illinois has, long ago, already decided the central winner question presented in this case. A gambling-house proprietor cannot avoid loss-recovery liability by putting employees or agents at the table to gamble for the house. In *Zellers v. White*, 208 Ill. 518, 524 (1904), the Illinois Supreme Court held the proprietor liable as the winner because two of the players were "in Zellers' employ and playing for him." *Id.* at 523. The proprietor did not personally play a hand. That did not matter. The employees were the house players; their wins were the house's wins.

The First Amended Complaint alleges the modern equivalent. Kalshi does not merely provide a neutral venue on which unrelated customers wager against one another. It has an affiliated proprietary-trading operation (Kalshi Trading LLC) that takes so-called "event-contract" positions for its own account opposite retail customers [FAC ¶¶ 24–25, 79–81]. KalshiEX supplies the market and matching engine; Kalshi Trading supplies house-side liquidity and takes proprietary positions; Kalshi Klear clears and settles the trades; and the entities allegedly operate as an integrated enterprise with common systems, records, and control [FAC ¶¶ 5–6, 9, 29–30, 57, 87–89, 176–91]. If Kalshi's proprietary traders take the opposite side of a customer's wager for the enterprise and the house-side position wins, *Zellers* supplies the answer: the principal cannot avoid winner status by interposing an employee, affiliate, or trading agent between itself and the gambler. Kalshi has told the CFTC that this affiliate was "established as a profit-making enterprise to help support liquidity on the Exchange" and has "often account[ed] for a substantial portion of relevant quotations and trading volume." Kalshi's own rules make all trading "fully anonymous," so that only Kalshi's records can show who took the other side of any trade [Proposed SAC ¶ 83].

*Pearce v. Foote*, 113 Ill. 228 (1885), applies the same rule to a broker that took the other side of its customer's wagers. The broker argued that it had merely traded with others on the board

of trade. The Illinois Supreme Court held that "[a]ll persons actively participating are principals," and that a customer who "*could not*, know" anyone else in the transactions lost to the firm that took his money. *Id.* at 238 (emphasis added). *Reuter v. MasterCard International, Inc.*, 397 Ill. App. 3d 915, 925–26 (2010), later described *Pearce* as a case in which the defendants "directly participated in gambling." *Id.* at 926.

Together, *Zellers* and *Pearce* defeat the corporate form defense that Kalshi's motion assumes. *Zellers* prevents a gambling enterprise from saying, 'the house did not gamble; our employees did.' *Pearce* prevents a direct counterparty from saying, 'we were not the winner because the money later moved elsewhere.' Applied to the FAC, those rules permit liability not only against the individual proprietary counterparty that happened to appear in a matching record, but against each Kalshi entity plausibly alleged to have acted as principal, agent, beneficial owner, or joint operator of the house-side wagering enterprise [FAC ¶¶ 29–30, 79–89, 176–91]. Discovery will identify the precise allocation of each role; Rule 8 does not require Plaintiff to reconstruct Kalshi's internal relationships before obtaining Kalshi's own records.

At a minimum, any dismissal (should there be one, which Plaintiff does not think is required on this pleadings record) should be without prejudice, with leave to amend after Kalshi produces the limited order, matching, clearing, and settlement records that identify the winning counterparty on the named Illinois participants' trades.

Kalshi does not contest specific jurisdiction on the Illinois claim, because the FAC names KalshiEX, Kalshi Trading, and Kalshi Klear directly and alleges the in-forum transactions that *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014), and *Liu v. Monthly*, 170 F.4th 1090 (7th Cir. 2026), require. What remains are fact disputes, such as: whether a particular loss fell inside the six-month window, and/or whether Kalshi Trading

held the other side of a particular trade. The resolution of these questions turns on records only Kalshi holds. Those are questions for summary judgment or trial, not Rule 12(b)(6).

Preemption is an affirmative defense that supports dismissal only if the complaint pleads every fact it requires, and this complaint pleads the opposite: these are wagers, not swaps [FAC ¶¶ 2–4, 62, 70–78]. Two courts of appeals have now rejected Kalshi's position. *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 U.S. App. LEXIS 26395 (9th Cir. Aug. 28, 2026); *KalshiEX LLC v. Schuler*, Nos. 26-3196/26-5235, 2026 U.S. App. LEXIS 29542 (6th Cir. Sept. 25, 2026). They conflict with the divided decision Kalshi leads with, *KalshiEx, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026). New Jersey has asked the Supreme Court to resolve the split. *Flaherty v. KalshiEX, LLC*, No. 26-299 (U.S. petition docketed Sept. 8, 2026).

Concurrently with this opposition, Plaintiff has moved for leave to file a Second Amended Complaint that pleads Kalshi's own statements and regulatory disclosures on each point Kalshi contests [Proposed SAC ¶¶ 77, 83, 118, 127, 194]. Should the Court find any deficiency in the operative pleading, the remedy is amendment, not dismissal with prejudice.

## STANDARD OF REVIEW

Rule 12(b)(6) tests the pleading, not the evidence. The Court accepts well-pleaded factual allegations as true and draws reasonable inferences in Plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim need only be plausible, not probable. *Twombly*, 550 U.S. at 556.

That distinction matters where the decisive facts sit inside the defendant's systems. Pleading rules account for that asymmetry, particularly where the details are peculiarly within the defendant's knowledge. *See Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023) (collecting authority from seven circuits, including the Seventh).

The FAC identifies the exact categories of records that will meet Kalshi's demands: matching, clearing, account, geolocation, proprietary-trading, and settlement records [FAC ¶¶ 86–89, 176–82]. Clearly, Kalshi is on notice as to the nature of the claims against it.

## ARGUMENT

The Court dismissed the original complaint because it alleged only that Kalshi's platform was available in Illinois, not "that transactions on the platform occurred in Illinois," and did not allege the amount or date of any loss. *Lavery v. Kalshi Inc.*, No. 25 C 14184, 2026 WL 2018471 (N.D. Ill. July 13, 2026) [Dkt. 37 at 8, 11–12]. The First Amended Complaint (the "FAC") cures both defects. It names Illinois residents (Luis Cuevas and Temuujin Shaariibuu) who, by their own pleading, used the platform while located in Illinois and lost money there [FAC ¶¶ 111–27]; it pleads the window of each recoverable loss and the basis for it [FAC ¶¶ 112–19 &121–27]; and it alleges that Kalshi Trading LLC takes positions for its own account opposite retail customers and keeps the money they lose [FAC ¶¶ 24–25 & 79–81].

## I. *ZELLERS* CONTROLS: A HOUSE THAT EMPLOYS GAMBLERS TO PLAY FOR THE HOUSE IS THE "WINNER."

*Zellers* is not an old gambling case. It is the Illinois Supreme Court's direct answer to the device Kalshi's corporate structure presents. The defendant kept a gambling room. The plaintiff lost money playing poker against several men, including Downey and Kaiser, who were "in Zellers' employ and playing for him." *Zellers*, 208 Ill. at 523.

The proprietor argued that he could not be the statutory winner because he had not personally played poker against the plaintiff. The Illinois Supreme Court rejected the argument. Downey and Kaiser were playing as the proprietor's agents, and the proprietor was responsible for what they won on his behalf. *Id.* at 524. The court made the point with the house's own banking

game: if Zellers "employed an insolvent individual to operate the wheel for him, as a result of which the wheel or the operator won the money of the player for Zellers as the proprietor," the player "would be unable to recover from the winner"—and "[t]he proposition carries with it its own answer." *Id.* Kalshi Trading is that operator. *Reuter* later summarized *Zellers* in precisely these agency terms: the employees played with house chips, their winnings belonged to the owner, and basic agency principles made the owner the winner. 397 Ill. App. 3d at 926. That rule is broader than the identity of the person whose name appears on a single wager. When the house supplies the capital, employs or controls the players, and takes the economic benefit of their wins, the house is itself the winner. The statute follows the principal behind the wager.

### A. The FAC alleges the same house-player structure as *Zellers, but* in modern form.

The FAC alleges that Kalshi Trading takes event-contract positions for its own account opposite retail customers and that, when those positions prevail, it receives the money paid and lost by the customer [FAC ¶¶ 24–25, 79–81]. The allegation is not that Kalshi Trading merely posts prices, routes an order, or charges a commission. It allegedly puts house capital at risk on one side of the same binary event contract held by a customer – i.e., any given customer, or unknown customer(s). Each event contract pays $1 if the event occurs and nothing if it does not, and customers buy contracts at prices between one and ninety-nine cents. A customer who buys 10,000 "Yes" contracts on a Super Bowl outcome is filled, in pieces, against whatever opposite positions are resting on Kalshi's order book—some for one contract, some for thousands—held by participants across the country whom the customer cannot identify, because Kalshi's rules make all trading "fully anonymous" [Proposed SAC ¶ 83]. Some of those positions belong to Kalshi Trading. The remaining Kalshi entities allegedly supply the infrastructure that makes that house wagering possible.

KalshiEX operates the venue and matching engine; Kalshi Klear clears and settles positions and records the recipient of the losing side; the entities share systems and operate as an integrated enterprise; and the FAC pleads in the alternative that each Defendant received, retained, or shared losing participants' money or acted as principal or agent of the winner [FAC ¶¶ 5–6, 9, 29–30, 57, 87–89, 176–91].

Those allegations permit the same inference *Zellers* permitted. If Kalshi Trading's proprietary traders are house players acting for the Kalshi enterprise, the enterprise cannot avoid section 28-8 by saying that the customer technically matched with the proprietary affiliate rather than the exchange entity. The legal question is whose business the house players were conducting and for whose account the resulting gain was obtained.

Kalshi's motion demands transaction-level and entity-level precision that only its own records contain: which entity funded, employed, bore the risk of, booked, and ultimately retained each proprietary position. Those are questions of proof, not pleading, and the FAC identifies the records that will answer them.

*Zellers* itself shows why the pleading cannot be reduced to the name on the chips. The employees physically played. The principal was nevertheless liable because the employees were gambling for him. 208 Ill. at 524. So too here, the FAC may plead the house player and the principals or agents behind that player in the alternative until discovery reveals the precise agency and settlement structure.

### B. *Pearce v. Foote* confirms that a direct counterparty is the winner even if the money moves to others.

*Pearce* involved an illegal wagering contract dressed as a grain transaction. The customer contracted directly with the broker. If the market moved against the customer, he paid the broker; if it moved in his favor, the broker paid him. 113 Ill. at 237–38. The broker therefore stood on the

opposite side of the wager. The broker argued that it was not really the winner because it had traded with other members of the board of trade, who were the real winners. As *Reuter* later described it, the broker "had contracts with other dealers on the board of trade which required it to pay to them what it won from the purchaser." 397 Ill. App. 3d at 925. The Illinois Supreme Court rejected the argument. The customer owed his gambling loss directly to the broker and had no concern with what the broker later did with the proceeds. *Id.* at 238.

The same principle applies to a vertically integrated exchange, proprietary trader, and clearer. If a retail customer loses to Kalshi Trading on the matched position, Kalshi Trading is a winner even if the resulting cash or settlement credit later moves through Kalshi Klear or another affiliate. *Pearce* makes the customer's direct gambling relationship the starting point, not the defendant's later internal accounting.

And if another Kalshi entity is the principal for whom the proprietary trader acts, *Zellers* reaches the principal as well. The two cases therefore work together: *Pearce* reaches the direct house-side counterparty; *Zellers* reaches the principal whose agent or employee placed the wager for the house. At the pleading stage, the FAC may proceed against both theories in the alternative.

### C. ***Reuter*, *Sonnenberg*, and *Phillips* (the "Facilitator Cases") support, rather than defeat, the house-played theory.**

The Facilitator Cases all turn on the same missing fact: the defendant did not wager against the customer. *Reuter* held that credit-card companies were not winners because their transaction was complete before the gambling occurred, their fees did not depend on the outcome, and they were not parties to the gambling contract. 397 Ill. App. 3d at 923–26. In distinguishing *Pearce* and *Kruse*, *Reuter* emphasized that those defendants "directly participated in gambling." *Id.* at 926.

*Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509, 510–11 (7th Cir. 2016), reached the same conclusion for a poker operator that merely took a rake from player-versus-player

games. The operator had no stake in which customer won. *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 739–40 (N.D. Ill. 2016), likewise found no winner status where the operator retained the proceeds from selling virtual chips whether the customer later won or lost. A winner, *Phillips* explained, must have "a direct stake in the outcome of the gambling," and it read *Pearce* as "holding that brokers were winners because they participated in the risk of the trade." *Id.* at 740 (quotation omitted).

Those decisions help Plaintiff because the FAC alleges exactly what was absent there: house-side participation. Kalshi Trading allegedly risks its own account on the customer's opposite position. Its return turns on the same event that determines whether the customer wins or loses. That is direct participation under *Pearce* and house play under *Zellers*.

### D. All Kalshi Entities may be pleaded as "winners" to the extent they are principals, agents, or beneficial owners of the house-side gaming gain.

Plaintiff does not contend that corporate affiliation alone makes every Kalshi entity a winner. The theory is narrower and grounded in *Zellers*. A principal is liable when its agent gambles for the principal's account. A direct participant is liable under *Pearce* when the customer loses directly to it. And the FAC alleges, in the alternative, that the Kalshi entities received, retained, or shared the losing participants' money or acted as principal or agent of the winner [FAC ¶¶ 29–30, 191].

Those allegations support alternative winner theories as follows. Kalshi Trading is a winner if it directly held the successful proprietary position opposite the customer. Kalshi Inc. or another Kalshi entity may be a winner under *Zellers* if Kalshi Trading or the proprietary traders acted as its agents and gambled for its account. Kalshi Klear or another affiliate may be a winner if the evidence shows that it was not merely a ministerial clearer but beneficially owned or shared in the gambling gain. And multiple entities may be liable where the evidence shows principal-agent

relationships, shared beneficial ownership of the house-side position, or a joint operation in which the proprietary gamblers acted for more than one principal. *Zellers* itself read the leading broker case that way: *Kruse v. Kennett* held the broker a "winner," "but there was no holding that the suit could not be maintained against such other person or persons who had profited by the transaction." 208 Ill. at 524–25. And *Reuter* distinguished the facilitators before it from a defendant who "directly shared in the profits" of the gambling. 397 Ill. App. 3d at 927.

That conclusion does not collapse corporate separateness. It applies ordinary agency and direct-participant rules to each entity's actual role. Discovery may ultimately narrow the liable entities. But Rule 12 is not the stage to choose among alternative principal, agent, counterparty, and recipient theories when the relevant employment, funding, control, matching, clearing, and intercompany records all belong to Defendants.

### E. The statutory exchange exclusion is an affirmative defense Kalshi has not raised, and it does not defeat the *Zellers* theory on the pleadings.

Section 28-8 excludes certain persons who transmit or execute orders and persons who execute transactions for their own account 'on any regular board of trade or commercial, commodity or stock exchange.' 720 ILCS 5/28-8(a). That language does not exempt every entity that calls itself an exchange or every proprietary trader operating on any trading venue. The transaction must occur on one of the qualifying types of exchange identified by the General Assembly.

The FAC does not concede that Kalshi's sports-event wagering venue satisfies that Illinois classification, which as a statutory exclusion would be Defendant's burden to plead and prove. The FAC alleges binary positions settled by the outcome of sporting events, without antecedent commercial exposure or physical delivery [FAC ¶¶ 2–4, 62, 70–78]. Whether the venue and the particular transactions fall within the statutory exclusion is therefore a separate legal and factual

question. It does not erase the antecedent *Zellers/Pearce* allegation that the Kalshi house directly participated in the wagers. The distinction matters. First ask whether the defendant is a winner because it directly participated or because house players acted as its agents. Then ask whether a specific statutory exclusion removes that otherwise qualifying winner.

The exclusion is Kalshi's to plead and prove, not Plaintiff's to negate, for four independent reasons.

First, the structure of section 28-8(a). The statute first creates the cause of action: "[a]ny person who by gambling shall lose to any other person" $50 or more "may sue for and recover" it "in a civil action against the winner thereof." 720 ILCS 5/28-8(a). Only then, in a separate sentence, does it provide that certain persons shall not "be deemed a 'winner.'" *Id.* Every element of the claim can be stated without reference to that sentence; it merely withdraws a class of persons from the statute's reach. Illinois has long treated such a provision as a matter of defense. An exception or proviso that "is separable from the description and is not an ingredient thereof . . . need not be noticed in the accusation, being a matter of defense," and "[a] proviso which withdraws a case from the operation of the statute need not be negatived." *People v. Butler*, 268 Ill. 635, 638 (1915) (quoting 22 Cyc. 344). The rule turns "not by the position of the exception or proviso, but by its nature," *id.*, and here both point the same way: the proviso is a separate sentence that removes a class of persons from a cause of action already complete without it. *See id.* at 638–39 (an exception "in a subsequent clause or statute" is "matter of defense and need not be negatived in the pleading") (quoting *Lequat v. People*, 11 Ill. 330). Kalshi insists that the Act is penal and must be construed as such [Mot. at 8]. On Kalshi's own premise, the rule for penal statutes applies with full force.

Second, federal law allocates the burden the same way. It is a "familiar principle" that "[w]hen a proviso . . . carves an exception out of the body of a statute or contract those who set up such exception must prove it," and that "the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008) (first quoting *Javierre v. Central Altagracia*, 217 U.S. 502, 508 (1910); then quoting *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948)). That "longstanding convention is part of the backdrop against which" legislatures write, and it controls absent "compelling reasons" to place the burden elsewhere. *Id.* at 91–92. It applies with particular force where, as here, the exception is "laid out apart from the prohibitions." *Id.* at 91. The exchange proviso is that kind of exception.

Third, the consequence at the pleading stage. A plaintiff need not anticipate or plead around an affirmative defense, and dismissal on one is proper only "where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014) (quotation omitted). Nothing in the FAC establishes that a venue listing wagers on sporting events is a "regular board of trade or commercial, commodity or stock exchange" within the meaning of an Illinois statute, or that any Kalshi entity "execute[d] [a] transaction for [its] own account" on such an exchange. The FAC pleads the opposite: binary wagers on sporting events, with no antecedent commercial exposure and nothing ever delivered [FAC ¶¶ 2–4, 62, 70–78]. That is the kind of contract *Pearce* held to be gambling "whether on the board of trade or elsewhere." 113 Ill. at 235. And an exclusion that relieves a gambling winner of liability is read with the "just, if not liberal, construction" that *Pearce* requires for this statute, not stretched by "subtle finesse." *Id.* at 239–40.

Fourth, Kalshi has not invoked the exclusion. Its motion quotes the sentence but makes no argument from it [Mot. at 8]. An argument withheld until reply comes too late. Should Kalshi raise it, Plaintiff reserves all responses, including that the exclusion cannot validly be applied here.

## II. COUNT I STATES A CLAIM UNDER THE ILLINOIS LOSS RECOVERY ACT.

Kalshi attacks Count I on two elements: the six-month window and the identity of the "winner." 720 ILCS 5/28-8. The FAC pleads both.

### A. The FAC pleads the six-month element; the exact loss dates are in Kalshi's exclusive records.

The six-month clock runs from the date of the loss. *Sonnenberg*, 810 F.3d at 510. The FAC pleads that Cuevas and Shaariibuu each began using the platform in November 2024, transacted from Illinois for fourteen months, and sustained net losses, and on that basis that each incurred at least one qualifying loss over $50 before July 8, 2025, more than six months before each filed his own action on January 8, 2026 [FAC ¶¶ 112–18, 121–26]. This is a reasonable inference. For Stephens, the FAC pleads recurring use across the 2025 NFL season and at least one losing position no later than December 2025 [FAC ¶¶ 129–35]. The proposed Second Amended Complaint adds that Kalshi launched real-money sports contracts in January 2025 and that more than 90% of its 2025 trades were sports-related, which places the named participants' active trading squarely within the window [Proposed SAC ¶¶ 118, 127].

Kalshi answers that "net losses" over fourteen months do not fix the date of any particular loss [Mot. at 12–13]. True, but irrelevant. The date of each loss, like its amount and counterparty, is recorded in Kalshi's systems and nowhere else [FAC ¶¶ 86–89, 119, 127, 176–78]. That is a fact "peculiarly within the possession and control of the defendant." *Ahern Rentals*, 59 F.4th at 954 (quoting *Arista Recs. LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). Kalshi's argument (i.e., that a third-party claimant must plead the very transaction records the statute exists to reach), if

credited, would make § 28-8(b) unenforceable in every case. This was the precise outcome rejected by the Illinois Supreme Court in *Zellers*. The pleading standard requires a plausible claim, not facts only the defendant knows. *Twombly*, 550 U.S. at 556.

In its prior ruling, the Court noted that it did not require "granular specificity;" it required "the amount lost" and "the date of relevant transactions" [Dkt. 37 at 12]. The FAC supplies named Illinois residents, amounts over $50, and a loss window fixed by pleaded facts. Nor does the statute demand transaction-by-transaction tracing. In *Zellers v. White*, 208 Ill. 518 (1904), the Illinois Supreme Court rejected the argument that each loss could be recovered only from the person who won that particular hand, because that reading would have put the game beyond the statute's reach, *id.* at 525–27. A statute designed to make gambling "gains unavailing to the winner" and "to remove, to some extent, at least, the incentive to play," *id.* at 526–27, is not to be recast as a compensation scheme carrying a transaction-by-transaction pleading burden it does not impose.

Nor does it matter that Cuevas and Shaariibuu later sued on January 8, 2026. The right passes to "any person" once the loser "does not in fact pursue his remedy" within six months of the loss. 720 ILCS 5/28-8(b); *see Sonnenberg*, 810 F.3d at 510. Plaintiff seeks only losses that occurred before July 8, 2025 [FAC ¶¶ 118, 126]. The statute's "legal effect" is "to limit the time, in which the loser may bring his action, to six months, and to bar the bringing of such action after the lapse of that time," after which "any other person may sue the winner." *Kizer v. Walden*, 198 Ill. 274, 280 (1902). A loser who lets the six months pass "could maintain no action" at all. *Id.* at 283. A later, untimely suit cannot reclaim a right the statute has already passed to "any other person"; any other reading would let a loser defeat every third-party action with a stale filing. And the suit Kalshi points to was voluntarily dismissed without recovery [FAC ¶¶ 8, 183].

**B. The FAC pleads a statutory "winner"—Kalshi Trading LLC, the proprietary counterparty that keeps the loser's money.**

Prediction-market trading is not new to Illinois law. In *Pearce*, a customer engaged a Chicago Board of Trade firm to trade "exclusively in differences in options,—betting on the market," with no grain ever to change hands. 113 Ill. at 233–34. The Illinois Supreme Court held the arrangement a gambling contract—"obviously fictitious," and gambling "whether on the board of trade or elsewhere"—and held the firm that took the customer's losses liable as the "winner." *Id.* at 234–35, 237–38. Kalshi's event contracts are the same instrument in modern form: contracts on a contingent event, settled entirely in cash, with nothing delivered [FAC ¶¶ 2–4, 62, 70–78].

*Pearce* also answers Kalshi's counterparty objection. The firm there argued that it had merely traded with others on the exchange and so had won nothing. The Court disagreed: "All persons actively participating are principals," it is "immaterial to which one the money or property lost was in fact paid," and "paying to either principal is, in law, paying to the 'winner.'" *Id.* at 238. The customer "did not, and could not, know any one else in the transactions," so the firm that took his losses was the winner. *Id.* The same is true on Kalshi's anonymous order book, where no trader can know who took the other side of a fill [Proposed SAC ¶ 83]. And *Pearce* rejected the narrow construction Kalshi urges [Mot. at 8]: although the statute is penal, it receives "a just, if not liberal, construction," and "no subtle finesse of construction" should defeat it, particularly because the vice "seemingly has the sanction of honorable commercial usage in its support." *Id.* at 239–40.

The "winner" is "a person whom a player had played with and lost to." *Sonnenberg*, 810 F.3d at 510; *see id.* at 511 (citing *Pearce*, 113 Ill. at 238). The FAC pleads that Kalshi Trading "takes event-contract positions for its own account opposite retail customers" and, when its position succeeds, "receives the money that customer paid and lost" [FAC ¶¶ 24–25, 79]. A party that risks its own money against the customer and keeps the loss is the paradigmatic winner, which

is the opposite of the rake-taking house in *Sonnenberg*, which "ha[d] no stake in the outcome." *Id.* at 511.

Part I answers Kalshi's contention that the claims against Kalshi Inc. and Kalshi Klear rise or fall with Kalshi Trading [Mot. at 14 n.7].

Even the authorities Kalshi cites confirm the distinction. The defendants in *Sonnenberg* (a rake), *Langone v. Kaiser*, No. 12 C 2073, 2013 WL 5567587, at **6–7 (N.D. Ill. Oct. 9, 2013) (a fixed prize pool funded by entry fees), and *Anderson v. Naperville Rotary Charities Inc.*, 2019 IL App (1st) 180312-U (arranging the transactions), took no position for their own account against the loser. Kalshi Trading does [FAC ¶¶ 24–25, 79–81], and "[a] bookmaker does not stop being a bookmaker by separately incorporating the side of the transaction that wins" [FAC ¶ 81]. Illinois courts have drawn the same line, holding allegations that the defendants "operated and controlled the two websites" on which the wagers were placed "sufficient to distinguish" the third-party-website cases. *Lawson v. Iaderosa*, 2020 IL App (3d) 180609, ¶ 15.

Kalshi's objection that the FAC does not allege Kalshi Trading held the opposite side of the *specific* Cuevas, Shaariibuu, or Stephens trades [Mot. at 14–15] improperly demands allegations based on information contained only in Kalshi's books and records. Kalshi intentionally built its market that way. Under its own rules, all trading on its central limit order book "is conducted on a fully anonymous basis," and an order is filled against available opposite orders until it is complete, so a single order may be split among many counterparties [Proposed SAC ¶ 83]. No gambler—<u>**not even a loser suing on his own account**</u>—can know who took the other side of a given fill. Only Kalshi's matching and clearing records show it [FAC ¶¶ 87–89]. The Ninth Circuit has recognized the same structure, describing Kalshi Trading as "Kalshi's affiliate that acts as a 'significant player on the exchange,' largely as a market maker." *Assad*, 2026

U.S. App. LEXIS 26395, at *35 n.5. The FAC pleads every link in the chain: named Illinois participants who transacted from Illinois and sustained qualifying losses [FAC ¶¶ 111–27]; an affiliated proprietary trader that takes positions opposite retail customers and keeps the loser's money [FAC ¶¶ 24–25, 79–81]; Kalshi Trading's winning position opposite at least one qualifying Illinois loser [FAC ¶ 189]; and the Kalshi-controlled records that identify the winning counterparty on each trade [FAC ¶¶ 86–89, 176–78]. Kalshi's own regulatory filing makes the inference more than plausible. In a 2021 notice to the CFTC, of which the Court may take judicial notice [Dkt. 37 at 9–10], KalshiEX disclosed that its affiliate was "established as a profit-making enterprise to help support liquidity on the Exchange" has "often account[ed] for a substantial portion of relevant quotations and trading volume," and "likely will continue" to do so [Proposed SAC ¶ 83]. A participant who traded for months in markets where the house affiliate supplied a substantial share of the volume more likely than not lost to it at least once [Proposed SAC ¶¶ 118, 127]. That is enough at the pleading stage; whether Kalshi Trading in fact held a given position is proved from Kalshi's production, not pleaded from records Kalshi controls.

The FAC also pleads, in the alternative, that KalshiEX is a winner to the extent of its fees [FAC ¶¶ 82–83, 190]; the Court need not reach that theory, which the proposed Second Amended Complaint subordinates to the Kalshi Trading counterparty theory [Proposed SAC ¶ 194].

### C. Kalshi's "double recovery" policy argument contradicts both the statute and the FAC.

Kalshi calls this suit "absurd" because Cuevas and Shaariibuu once filed a class action [Mot. at 15–16]. But the FAC seeks only losses that are not being recovered by the loser and disclaims any loss "refunded, settled, recovered, or timely placed at issue" [FAC ¶¶ 8, 118, 126, 183], and the class action was voluntarily dismissed without recovery. That is the precise circumstance in which the statute vests the right in "any person": the loser "does not in fact pursue

his remedy." 720 ILCS 5/28-8(b). The statute's history confirms the point: its predecessor cut off a third-party suit only where the loser, within six months, did "really and bona fide, and without covin or collusion, sue and with effect prosecute" the claim. *Kizer*, 198 Ill. at 280 (quoting statute). A complaint filed after the window closed and then dismissed without recovery does neither. Nor is private enforcement absurd; it is the design. The Act "was intended to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism." *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997).

**D. Plaintiff does not stand in the losers' shoes; the section 28-8(b) right is his own.**

Kalshi's timing, "double recovery," and "piggyback" arguments rest on one premise: that Plaintiff steps into the shoes of Cuevas and Shaariibuu and takes their claims subject to whatever they later did [Mot. at 12–16]. The premise is wrong. Section 28-8(b) does not assign the loser's claim to anyone. It bars the loser's claim and creates a different one, held by a different person, for a different measure of recovery, to serve a different end.

The text establishes the point. Subsection (a) gives the loser a right to recover only "the money or other thing of value, so lost and paid or delivered." 720 ILCS 5/28-8(a). Subsection (b) is triggered only when the loser "does not in fact pursue his remedy" within six months. It then provides that "any person may initiate a civil action against the winner," and it directs judgment for "triple the amount" of the loss. *Id.* § 28-8(b). A claim for three times the loss, which the loser himself can never bring, cannot be the loser's claim passed along. A statute that confers a right on "any person" does not make that person anyone's assignee.

The Illinois Supreme Court has read the statute this way for more than a century. Its "legal effect" is "to limit the time, in which the loser may bring his action, to six months, and to bar the bringing of such action after the lapse of that time," after which "any other person may sue the

winner." *Kizer*, 198 Ill. at 280. Once the six months pass, the loser "could maintain no action" at all. *Id.* at 283. There is nothing left for a third party to inherit. The right that arises is the third party's own, and the court adopted the rule that, once it has "vested in the plaintiff," it is not "defeated by any agreement between the plaintiff and the loser." *Id.* (quoting Massachusetts authority). The loser's conduct matters in only one circumstance: where the third-party suit "was really and truly the suit of" the loser, brought in another's name to collect a penalty the loser is barred from collecting himself. *Id.* at 282. Kalshi does not suggest that here, and it could not. Plaintiff is a stranger to the losers and to their class action.

The statute's anti-collusion clause confirms that a loser's litigation choices cannot defeat the third-party right. That clause exists to stop a loser from filing a suit "not with a view of recovering the amount of the loss, but for the purpose of preventing a suit for treble the amount of the loss by any third person." *Id.* at 280–81. Kalshi asks the Court to give the losers' untimely, abandoned filing exactly that preclusive effect, which is the result the statute was written to prevent. Nor is the treble recovery the informer's windfall. It is authorized "not for the benefit of the informer, but for the punishment of the successful gamester and for the suppression of gaming," and the statute "when enforced is enforced for the public benefit." *Id.* at 286–87 (describing Massachusetts rule). Kalshi's "windfall" objection [Mot. at 16] is an objection to the statute itself.

The Court's July 13 opinion does not hold otherwise. The Court concluded that a third-party claim requires an underlying "illegal gambling transaction that is covered by the statute" [Dkt. 37 at 13]. Plaintiff agrees, and the FAC pleads that transaction. But the Court did not address *Kizer* or the statutory text discussed above, and it did not hold that a third party takes the loser's claim subject to the loser's later conduct. To the extent the opinion could be read to adopt a shoe-

stepping rule, Plaintiff respectfully submits that such a rule is contrary to *Kizer* and to the text of section 28-8(b), asks the Court not to extend it, and preserves the issue for appeal.

Applied here, the analysis is simple. For each loss before July 8, 2025, the six-month period ran before Cuevas and Shaariibuu filed their class complaint on January 8, 2026. At that point their own claims to those losses were barred, and the right to sue belonged to "any person." A class complaint filed afterward and voluntarily dismissed without recovery could not reclaim what the statute had already taken from the losers, and it cannot divest Plaintiff of a right that was his to assert. The Seventh Circuit treated the claims the same way in *Sonnenberg*: the gamblers' own suits were "time-barred," but their mothers' third-party claims were "timely." 810 F.3d at 510.

## III. THE COURT MAY EXERCISE PENDENT PERSONAL JURISDICTION OVER COUNTS II THROUGH IV.

Kalshi's pendent-jurisdiction argument depends on dismissal of Count I [Mot. at 16]. Count I survives, and Kalshi does not dispute specific jurisdiction over it.

The pendent claims arise from one nucleus of operative fact: one integrated enterprise operating one order book, one matching engine, one clearing entity, one proprietary-trading affiliate, one rulebook, and one decision to accept orders nationwide [FAC ¶¶ 5–6, 9, 29, 57–58]. A court with personal jurisdiction over a defendant on an anchor claim may adjudicate related claims arising from the same nucleus. *See Robinson Eng'g Co. Pension Plan & Tr. v. George*, 223 F.3d 445 (7th Cir. 2000).

*Vanegas v. Signet Builders, Inc.*, 113 F.4th 718 (7th Cir. 2024), is not to the contrary. It applied *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017), to nonresident opt-in plaintiffs whose claims had no tie to the forum. Here a single Illinois plaintiff sues one nationally operating enterprise on claims proved by the same records, at no meaningful added burden [FAC ¶¶ 59–60]. Requiring him to refile the same evidentiary case in three other districts would multiply

proceedings for no purpose. Any doubt on this point bears only on Counts II through IV, not Count I. And because the objection is jurisdictional, any dismissal of those counts must be without prejudice. Fed. R. Civ. P. 41(b).

## IV. COUNTS II THROUGH IV STATE CLAIMS, OR AT MINIMUM WARRANT LEAVE TO AMEND.

Each out-of-state count pleads a loser located in the forum State, a real-money wager placed there, a realized loss, the absence of licensure, and the lapse of the statutory period—with the transaction-level particulars, once again, resident in Kalshi's records.

**Massachusetts (Count II)**. The FAC alleges that No-Passion52, a Massachusetts resident, transacted from Massachusetts and suffered a realized loss that went unrecovered beyond the three-month period, and that Matt Kalish (the DraftKings co-founder who publicly called his own Kalshi position a "bet") funded and lost a real-money position from Massachusetts, again outside the statutory window [FAC ¶¶ 138–54, 194–202]. Kalshi is not licensed under Mass. Gen. Laws ch. 23K or ch. 23N, so the statutory exception does not apply [FAC ¶ 198]. And because the proposed Second Amended Complaint will be filed more than three months after Kalish's May 2026 transaction, Kalshi's timing objection to that transaction [Mot. at 17 & n.9] falls away on amendment.

**Kentucky (Count III)**. The FAC alleges that Kalshi accepted unlicensed Kentucky wagers—as the Kentucky Attorney General's enforcement action and Donovan Roberts's allegations corroborate (Plaintiff does not seek Roberts's own loss)—and that at least one Kentucky resident lost more than $5 and did not sue within six months [FAC ¶¶ 155–64, 203–10]. Kentucky's statute reaches a party that takes "a portion of the money lost" even without risking its own, so Kalshi's "winner" objection has the least force here. *See Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 807–08 (Ky. 2020).

**<u>Georgia (Count IV).</u>** Necessary-Pea4522 stated publicly that the user lived in Georgia and lost approximately $350 to $400 on the platform during 2025 [FAC ¶¶ 166–69]. Georgia's statute reaches a loss where "the gaming contract is made or the bet is laid within Georgia," without regard to where the winner or the money sits [FAC ¶ 165]; the losses went unrecovered beyond six months, and this action is within the four-year period O.C.G.A. § 13-8-3(b) allows [FAC ¶¶ 170–72].

If any count must name a specific loser it does not yet name, the remedy is leave to amend once Kalshi produces the records that identify those participants [FAC ¶¶ 176–82].

## V. FEDERAL PREEMPTION CANNOT BE DECIDED ON THIS MOTION AND DOES NOT BAR THESE CLAIMS.

### A. Preemption is an affirmative defense that must appear on the face of the complaint—and does not.

"Preemption is an affirmative defense, and pleadings need not anticipate or attempt to circumvent affirmative defenses." *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010). The proper vehicle for the defense is an answer and a motion for judgment on the pleadings, not a motion to dismiss. *See id.* Dismissal on that defense is proper only "where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Chi. Bldg. Design*, 770 F.3d at 614. This complaint pleads the opposite: no participant has any antecedent exposure to the sporting outcome; the customer's payment *creates* the risk rather than transferring it; nothing is deliverable; and no cash market uses the prices [FAC ¶¶ 2–4, 62, 70–78]. Whether these instruments are nonetheless swaps is a contested question the pleadings do not resolve in Kalshi's favor. If Kalshi wishes to prove otherwise, it must do so on a record. Fed. R. Civ. P. 12(d).

Kalshi's own words confirm the point. In the D.C. Circuit, Kalshi said an event contract involves "gaming" "if it is contingent on a game or a game-related event," and that "[t]he classic

example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." Brief for Appellee at *17, *41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. 2024) (quoted in *Assad*, 2026 U.S. App. LEXIS 26395, at *44–45). The Ninth Circuit agreed that, in substance, these contracts are sports bets. *Assad*, 2026 U.S. App. LEXIS 26395, at *32. The proposed Second Amended Complaint pleads these statements [Proposed SAC ¶ 77]. Kalshi cannot call sports contracts gaming when that helps it and place them beyond every State's reach when it does not.

Kalshi's express-preemption theory assumes that the CFTC's exclusive jurisdiction "applies to any instrument traded on a DCM" [Mot. at 20 n.13]. It does not. Section 2(a)(1)(A) covers only enumerated categories—among them "transactions involving swaps"—that are "traded or executed" on a designated market. The Ninth Circuit rejected Kalshi's identical argument that state law "is superseded as to [all] on-DCM transactions," because Congress "declined to grant exclusive jurisdiction to all on-DCM transactions." *Assad*, 2026 U.S. App. LEXIS 26395, at *26. The threshold question is therefore whether these instruments are swaps at all. *Id.* at *27. The Sixth Circuit held that even if they were, the CEA would not expressly preempt state gambling laws like these. *Schuler*, 2026 U.S. App. LEXIS 29542. And the Seventh Circuit has read the provision more narrowly still. *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1154 (7th Cir. 1992) ("[n]o one suggests that the CEA expressly preempts state law").

### B. Two courts of appeals have rejected Kalshi's premise that these are federally authorized swaps.

Kalshi's preemption theory rests on the premise that its sports-event contracts are swaps the CFTC has authorized it to list. Two courts of appeals have rejected that premise. The Ninth Circuit held that the contracts are likely not swaps, *Assad*, 2026 U.S. App. LEXIS 26395, at *49,

and that Kalshi's listing of them was unlawful under the Special Rule and CFTC Rule 40.11 because the Commission never conducted the review that could have permitted them, *id.* at *40–41. That removes the "federally authorized" premise on which Kalshi's motion depends. The Sixth Circuit held that Kalshi had not shown the contracts are swaps and, independently, that even if they were, the CEA does not preempt state gambling laws that only incidentally burden exchanges. *Schuler*, 2026 U.S. App. LEXIS 29542. Kalshi's lead case, *Flaherty*, is a divided preliminary-injunction ruling, and the conflict is now before the Supreme Court on New Jersey's petition. A defense in that posture cannot carry a Rule 12(b)(6) dismissal, still less one with prejudice.

### C. A backward-looking loss-recovery remedy is neither field- nor conflict-preempted.

Field preemption under the CEA reaches state law that "would directly affect trading on or the operation of" a designated market. *Am. Agric.*, 977 F.2d at 1156–57. A Statute of Anne judgment does not tell Kalshi what to list, how to run its matching engine, or whom to admit; it makes the winner of an unlawful wager give the money back. That is a private, retrospective remedy, not prospective market regulation. The Ninth Circuit drew the same line: state laws regulating gaming fall within "a field which the CEA has not preempted." *Assad*, 2026 U.S. App. LEXIS 26395, at *54; *accord Schuler*, 2026 U.S. App. LEXIS 29542.

Kalshi's conflict and "impartial access" arguments describe a prospective operational burden—being "forced to discriminate" among users by geography [Mot. at 24]—that a damages action for past losses does not impose. The Ninth Circuit rejected the same argument even as to prospective enforcement, noting that regulated entities geofence and that Kalshi "could do the same." *Assad*, 2026 U.S. App. LEXIS 26395, at *51–52. And the UIGEA definition Kalshi invokes, 31 U.S.C. § 5362(1)(E)(ii), defines "bet or wager" only for that Act's purposes; it neither

immunizes a state-law loss-recovery claim nor decides the swap question. *See Assad*, 2026 U.S. App. LEXIS 26395, at *31 n.4.

## VI. IN THE ALTERNATIVE, THE COURT SHOULD GRANT LEAVE TO AMEND RATHER THAN DISMISS WITH PREJUDICE.

If the Court finds any part of the FAC insufficient, dismissal with prejudice would still be improper. Leave to amend is "freely give[n]," Fed. R. Civ. P. 15(a)(2). Plaintiff has concurrently moved for leave to file a Second Amended Complaint that adds Kalshi's own D.C. Circuit statements, its regulatory disclosures about Kalshi Trading, and further facts tying the Illinois losses to the statutory window and to Kalshi Trading [Proposed SAC ¶¶ 77, 83, 118, 127]. If the Court concludes that the FAC must tie a particular Illinois loss to Kalshi Trading, Plaintiff asks that any dismissal be without prejudice and that leave to amend follow a limited production of the order, member, clearing, and settlement records for the named Illinois participants' trades—records only Kalshi holds. Because any gap is curable largely with facts in Kalshi's own records, the proper course is to deny the motion or, at most, to grant leave to amend.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Kalshi Defendants' motion to dismiss the First Amended Complaint. In the alternative, should the Court find any count deficient, Plaintiff requests leave to amend; dismissal with prejudice is not warranted.

Dated: October 5, 2026

Respectfully submitted,
MARK T. LAVERY, Plaintiff

By: /s/ Christopher V. Langone
One of his attorneys